**SOUTHWESTERN BELL MEDIA, INC., Plaintiff,**

v.

**TRANS WESTERN PUBLISHING, INC., and Landmark Publishing Company, Defendants.**

Civ. A. No. 87–2195–S.

United States District Court, D. Kansas.

July 6, 1987.

---

1. *Kelly v. American Standard, Inc.,* 640 F.2d 974 (9th Cir.1981).

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, Kan., Lawrence A. Rouse, Stinson, Mag & Fizzell, Kansas City, Mo., Jack C. Lorenz, St. Louis, Mo., Don M. Bradley, Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson, Kansas City, Mo., for plaintiff.

D.A.N. Chase, Wm. Bruce Day, Constance M. Jordan, Linde, Thomson, Fairchild, Langworthy, Kohn & VanDyke, P.C., Overland Park, Kan., John R. Cleary, Linde, Thomson, Fairchild, Langworthy, Kohn & VanDyke, P.C., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

The court has before it Southwestern Bell Media, Inc.'s [hereinafter Bell Media] motion for preliminary injunction, in which Bell Media seeks to enjoin Trans Western Publishing, Inc. [hereinafter Trans Western] from producing, utilizing, or financially benefiting from, any written or printed material that infringes on Bell Media's Yellow Pages copyright in violation of the copyright laws, 17 U.S.C. § 101 *et seq.* The principal form of relief sought by plaintiff is an order enjoining defendant from including in its contemplated 1987–88 directory any advertisement sold with the aid of the allegedly infringing book, a prototype telephone directory. After having conducted two hearings on this matter and having studied the parties' detailed and exhaustive briefs concerning this developing area of law, the court does not believe further oral argument would be useful and is prepared to make the following findings.

### FINDINGS OF FACT

1. As a result of the divestiture of the American Telephone and Telegraph Company in 1984, the local Bell Operating Companies were transferred to seven regional holding companies, one of which was Southwestern Bell Telephone Company [hereinafter Bell Telephone]. In the wake of the break-up of Ma Bell, the regional companies were exposed to competition from other long-distance telephone companies and from other telephone directory publishing companies. *See generally Western Union Telegraph Co. v. F.C.C.,* 815 F.2d 1495 (D.C.Cir.1987); *GTE Service Corp. v. F.C.C.,* 782 F.2d 263 (D.C.Cir. 1986). Bell Telephone remained in the Yellow Pages business by means of several subsidiary corporations, one of which is plaintiff Bell Media. Bell Media publishes an annual telephone directory, including the Yellow Pages, for the Wichita, Kansas metropolitan area. Through a contract titled "Listing Base/Update Agreement," Bell Media acquired from Bell Telephone Company (which is the local telephone company in Wichita) the "names, addresses, telephone numbers, and the business designation, if any, of the Telephone Company's subscribers" in the Wichita area. The purpose of acquiring this database was Bell Media's planned publication of a "directory," the scope of which the contract defined as "all directories published by [Bell Media] through use of the information supplied pursuant to this Agreement." The contract granted Bell Media a non-exclusive license to use the database information. Through the use of this information and also advertisements that either were preexisting in previous Bell Media (and pre-divestiture Bell Telephone) Yellow Pages or were subsequently created after direct contact with an advertiser, Bell Media constructed and distributed the Wichita telephone directory. On July 2, 1986, Bell Media received a copyright registration for its "Wichita and Vicinity Telephone Directory July 1986–87," Registration Number TX 1 861 092. In the copyright registration form, Bell Media stated that the directory which it was copyrighting had not previously been registered and that the application for copyright was the first application submitted by Bell Media as copyright claimant. In answer to the inquiry "Identify any preexisting work or works that this work is based on or incorporates," Bell Media replied that the classified telephone customer listings were the only preexisting material used. In response to an inquiry as to the material that was added to the copyrighted work that did not previously exist, Bell Media answered: "Reviewed Compilation of Classified Telephone Customer Listings."

2. Another regional holding company that existed after the divestiture was U.S. West, Inc. U.S. West held the same status as Bell Telephone, and accordingly formed its own subsidiaries to perform telephone and directory services. Its publishing subsidiary is defendant Landmark Publishing Co. [hereinafter Landmark]. Landmark purchased defendant Trans Western, a San Diego based company, to expand U.S. West's directory publishing capabilities be-

yond its traditional local telephone operations area. Therefore, Trans Western is in basically the same position with U.S. West as Bell Media is with Bell Telephone. The Wichita, Kansas metropolitan area was one of the markets that Trans Western targeted for publication of a telephone directory. As demonstrated by Trans Western, it is not unusual for one of the seven regional holding companies to attempt to shoehorn into the telephone directory or Yellow Pages market of a metropolitan area within the geographic border of a competing regional holding company. In fact, Bell Media has published Yellow Pages in the New York City area, the Washington, D.C. area, and the Tucson, Arizona metropolitan area, among others. In order to establish a presence in the Wichita area, Trans Western purchased a local directory publishing company, Southwestern Directory Services, Inc. [hereinafter SDS] (unrelated to Southwestern Bell Telephone Company), which had previously published a telephone directory, including Yellow Pages, for a number of communities outlying Wichita. SDS's 1984–1985 directory contained the following statement on the inside cover:

> Listings contained herein were transcribed by Southwestern Directory Services, Inc. pursuant to a license from Southwestern Bell Telephone Company (from compilations copyrighted 1984 by Southwestern Bell Telephone Company) and may not be reproduced in whole or in part, or in any form whatsoever, without the consent of Southwestern Bell Telephone Company.

Trans Western plans to enter the Wichita directory market with a "thick" directory for the period September or October 1987–1988. The previous directories published by SDS were smaller books, with approximately 135 white pages (simple telephone listings) and 168 Yellow Pages. Trans Western's contemplated Wichita area book would have approximately 475 white pages and over 1100 Yellow Pages.

3. The thrust of Trans Western's entry into the Wichita market began in August, 1986. On August 25, 1986, Bell Telephone granted SDS a license to acquire a database containing the names, addresses, telephone numbers, and business designations of every Bell Telephone customer in Wichita. The agreement granting this license is identical to the agreement by which Bell Media obtained this same information and published its Wichita directory, the "Listing Base/Update Agreement." One aspect of the plan to produce a competitive directory was the creation of a prototype directory that Trans Western could take to Wichita businesses in an attempt to demonstrate that Trans Western's directory was not going to be a small one that potential customers would disregard, but rather one as large or larger than the existing Bell Media book. It is not difficult to understand that the thicker a Yellow Pages is, the greater chance that a consumer will turn to it for a complete listing of businesses that cater to the customer's particular need, and Trans Western desired to exploit this tendency. Trans Western assembled their prototype without conducting a canvass of the Wichita business community. By October 15, 1986, Trans Western salespersons began to use the prototype directory in their sales presentations to Wichita area businesses and other potential advertisers.

4. The evidence at the hearings and in the exhibits demonstrate that Trans Western, in creating its prototype directory, copied a substantial amount of the Yellow Pages portion of its prototype from the Bell Media 1986–87 Wichita and Vicinity Telephone Directory. Bell Media presented the testimony of Ann Karwoski, an employee of Southwestern Bell Yellow Pages Company, to support this fact. She worked in the area of Yellow Pages marketing and part of her duties was examining Yellow Pages published by non-Bell companies. She had performed an analytical and statistical comparison of Bell Media's 1986–87 directory's Yellow Pages and the Trans Western prototype directo-

ry.[1] Out of her study came the following results: She examined 32 errors in the Bell Media book that had been brought to the company's attention by its customers, and of those 32, 29 were repeated in the Trans Western book. In other words, Trans Western lifted the business listings out of the Bell Media book, error and all, and reproduced them in its own book. For example, wrong telephone numbers or misspelled words in the Bell Media book appeared identically in the Trans Western book. Another example of copying concerned the maps and Gold Pages coupons that appear in the Bell Media book. Certain listings in the Bell Media book directed the reader to turn to the back of the directory for coupons offered by the particular business or for reference to a map on which the customer could find the location of the business. In the Trans Western book, certain listings offered this same advice, but the Trans Western book did not have any coupons or locator maps. In a statistical comparison, Ms. Karwoski determined that the Trans Western book reproduced approximately 95% of the 35,000 business listings that were contained in the Bell Media book. That is, if the Bell Media Yellow Pages included "Riley's Building Supply, Inc." in its business listings, Trans Western's book included such a listing also, so that 95% of the listings were reproduced. Of the 5% noncorrelation, Ms. Karwoski testified that all but one-half of 1% constituted deletions that Trans Western had made. The remaining noncorrelative listings were additions, new listings that appeared in the Trans Western book but not the Bell Media book. Furthermore, Ms. Karwoski found that there was a 93% similarity between the in-column space ads in the Bell Media book and the Trans Western book. Finally, Ms. Karwoski found a 93% correlation between heading classifications used by the two books. Summarizing this evidence, there is no question that in putting together the prototype, Trans Western did not contact every business that appeared in its prototype book to see whether the advertiser wished to be listed; rather, Trans Western reproduced a substantial portion of the Bell Media 1986–87 book in creating its prototype, and used this prototype as a tool in attempting to lure advertisers to its planned 1987–88 Wichita directory.

5. As for Trans Western's sales technique, Bell Media presented the testimony of a Wichita area businessman who was called upon by a Trans Western salesman. The businessman, who incidentally was a private detective, recorded his conversation with the Trans Western salesman. The salesman brought the prototype as a sales aid, and represented that the book was not being distributed to the public (which the court accepts as established in this case), but rather was used only to show businesses what the Trans Western book would look like. As for the content of the prototype, the salesman indicated that much of the information in the Bell Media book was essentially identical to the prototype because Trans Western had purchased the database from Bell Telephone, and so the information that Trans Western had was the same information that the advertiser or business had given Bell Telephone. The salesman also stated that Trans Western "reproduced it [in the prototype], but we put a couple of things in the ad," such as additional or substituted artwork or a rearrangement of the information. In general, the Trans Western salesman was not derogatory or antagonistic toward Bell Media and actually complimented them in several respects, but he focused on the particulars in which Trans Western perceived itself to be superior to Bell Media. Trans Western supplied approximately 6,000 of these prototype directories to Wichita area businesses in furtherance of its sales efforts.

---

1. The Yellow Pages typically includes three methods of portraying a business—alphabetical listings in columns, in-column space ads, and larger display ads (usually including some artwork) placed outside of the alphabetical listings. The in-column space ads are merely alphabetical listings with a greater amount of information (and occasionally some artwork) added.

6. Trans Western's efforts in the Wichita area have caused a substantial number of businesses to eliminate or reduce their advertising in the Bell Media book and switch their principal advertising outlays to the Trans Western book. This has resulted in a demonstrable decrease in revenue for Bell Media.

7. The evidence established that at least by mid-December, 1986, top management for Southwestern Bell Yellow Pages knew the sales method that Trans Western was employing and had in its possession a prototype directory. Steve Connor, regional manager for Southwestern Bell Yellow Pages, testified that when he acquired a copy in mid-December, he had no reason to believe that the Trans Western directory was essentially a copy of the Bell Media book. Connor also testified that in January or early February, 1987, while at a Wichita restaurant, he discovered that the pay telephone on the premises had a Trans Western directory lying beside it. He further testified that it was not until early March, 1987, that he discovered that Trans Western directory listings had not been obtained through customer contacts, when Bell Media customers called to complain that an advertisement concerning their business was appearing in the Trans Western book. The customers were apparently concerned that they would no longer appear in the Bell Media directory. Bell Media filed its complaint and request for temporary restraining order on April 29, 1987. On that same day, after an adversary hearing, the court entered a temporary restraining order prohibiting defendant from publishing, using or distributing its prototype directory.

## DISCUSSION

It must be emphasized here that although Bell Media's complaint listed four causes of action (copyright infringement, unfair competition, tortious interference with prospective business relationships, and false designation or origin), the only issue presently before the court is Bell Media's motion for preliminary injunction. Bell Media's grounds for the temporary restraining order and the preliminary injunction are the copyright infringement and exploitation of the infringing work in the Wichita area. Therefore, the first determination to be made is whether Trans Western had infringed Bell Media's copyright on the Wichita and Vicinity Telephone Directory 1986–87.

By its own admission, Bell Media is not complaining about Trans Western's production of white pages. It is only the Yellow Pages that Bell Media is presently objecting, although the copyright registration indicates no distinction between the two and Bell Media places its copyright symbol on *every* page of its Wichita directory—white, blue, and yellow. The following represents the gist of plaintiff's allegation:

Media purchases telephone subscriber information from Southwestern Bell Telephone Company. It contacts through its sales agent, SW Bell Yellow Pages, Inc., every business subscriber, works with the subscriber to determine the appropriate headings under which the name should appear, and sells advertising. Media owns the copyright in its compilation in the published directory.

Trans Western took Media's compilation of listings and copied them—mistakes included—into its 1987 directory. By infringing Media's copyright, Trans Western avoided all the work and expense of contacting each listing, verifying the information, and preparing its own compilation. By infringing, it was able to take to potential advertisers a complete yellow pages directory that included all the business listings for the Wichita metropolitan area, properly classified under appropriate headings with related display ads. But the directory that Trans Western was and is showing to customers was not its own: it was and is the copyrighted product of Media placed in a slightly different format.

Plaintiff's Memorandum in Support of Temporary Restraining Order, at 1–2.

To establish a claim of copyright infringement under 17 U.S.C. § 501, a plaintiff must prove by a preponderance of the evidence that it has a valid copyright in a work and that the defendant has copied the work. *Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986). It is uncontroverted that the plaintiff has a certificate of copyright registration, which provides an inference of the validity of a copyright. *See Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801, 811 (11th Cir.1985). It is also well established that a telephone directory can be copyrighted. *See Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128 (8th Cir.1985); *Southern Bell, supra.* The principal question in establishing a valid copyright in this case, then, concerns exactly what it is that Bell Media has copyrighted. The Eleventh Circuit adopted the following statement from the United States District Court for the Northern District of Georgia relating to the extent of the copyright of a telephone directory:

> *The information and design of that information contained in a telephone directory may be in the public domain or the property of the advertiser,* but the effort involved in preparing artwork and layout, and in the selection, compilation and arrangement of the information contained therein constitutes a work of authorship subject to copyright protection.

*Southern Bell,* 756 F.2d at 812 (emphasis in circuit court opinion). Therefore, the court found that the individual advertisements themselves can be copied and reproduced with the permission of the particular advertiser, but a directory publisher cannot copy the compilation format that an existing directory employs in presenting the telephone listings and advertisements. This is the extent of the valid copyright that Bell Media holds for its Wichita and Vicinity Telephone Directory. Plaintiff has adequately notified the public of its copyright of the directory by inserting a copyright notice on each page, including Yellow Pages.

The next question is whether Trans Western has copied the protected work. A primary consideration is that Trans Western has purchased the right to use the names, addresses, telephone numbers, and the business designation, if any, of each of Bell Telephone's customers in the Wichita area. In most of the prior federal court decisions dealing with copyright infringement in the area of telephone directories, the guilty party simply photocopied the existing directory or produced an identical listing of white pages, which is a much clearer case of copyright infringement. In the present case, Trans Western did not produce an exact, or even nearly exact, copy of the Bell Media book. In a nutshell, Trans Media took essentially the same information contained in Bell Media's Yellow Pages and put it in a slightly different format. The following is a comparison of the two formats:

### Similarities

I. *Heading Classifications*

These are titles such as "Pharmacies" or "Florists-Retail" under which a business may choose to be listed or to advertise. Often, the telephone directory company includes heading classifications under which no businesses are listed, in which case the directory instructs the readers to turn their attention to a different heading where the desired information might be found, such as "Agricultural Equipment—See Farm Equipment." After reviewing a sampling of the two directories, it appears that whenever the Bell Media had a heading classification under which at least one business was listed, Trans Western invariably included the identical heading with an occasional spelling or punctuation correction. The court found one instance of Trans Western having a heading that was not in the Bell Media book. Finally, whenever Bell Media included a heading under which no businesses were listed and which directed the reader to another heading, Trans Western omitted the referring heading approximately 90% of the time. This is consistent with the

testimony offered by Ms. Karwoski, in which she found a 93% correlation in classification headings.

## II. *In-Column Space Ads*

As Ms. Karwoski testified, there was an approximately 93% correlation between space ads in the two books. That is, if the Bell Media book had 1000 space ads in its book, Trans Western inserted a space ad for those particular businesses in somewhat over 900 instances. The space ads in the Trans Western book were by no means replicas of Bell Media's. Although they included the same basic information as in the Bell Media book, Trans Western occasionally rearranged the ad and enlarged or shortened it in most instances.

## III. *Business Listings*

Ms. Karwoski testified that there was a 95% correlation between the businesses listed in Bell Media's directory and those in the Trans Western book, and that the vast majority of the remaining 5% were simply deletions by Trans Western.

## IV. *Display Ads*

Trans Western reproduced many of the larger display ads, and commonly included the identical illustrations in a slightly rearranged and different-sized version, although Trans Western did substitute a substantial amount of artwork. The *only* businesses for which Trans Western included a display ad were those for which Bell Media had a display ad, a nearly 100% correlation.

### *Dissimilarities*

## I. *Heading Classifications*

Although there was a 93% similarity between the actual classifications used in both books, the Trans Western book used larger type and it underlined each heading, unlike the Bell Media book.

## II. *In-Column Space Ads*

As noted above, Trans Western often tailored the Bell Media space ads to present a different look.

## III. *Business Listings*

Each business listing in the Trans Western book is bold type, while it appears that only those who paid a premium received the bold type in the Bell Media book and the majority of business listings are not bold type.

## IV. *General Format*

The Trans Western book uses three columns in its book while Bell Media uses four. The Trans Western book thus appears to contain far less information on each pages and is generally more readable.

## V. *Display Advertisements*

Although it appears that Trans Western included a display ad whenever such an ad appeared in the Bell Media book, Trans Western substantially rearranged the ad and often added or deleted artwork and illustrations. The same basic information appears in both ads, including slogans, logos, etc., but the look of the ads is usually different.

It is clear to this court that Trans Western took a Wichita and Vicinity Telephone Directory to its San Diego headquarters and used the information and layout of the Bell Media book to construct a book of its own. The changes that it made were generally superficial alterations and rearrangements. When Bell Media used a certain heading, so did Trans Western. When a Bell Media customer had a space ad in the directory, Trans Western also inserted a space ad for the customer. If the customer had purchased a display ad, Trans Western provided a similar ad as well. If there is any major difference that jumps out at the reader, it is Trans Western's use of three columns and enlargement of space and display advertisements, none of which lessens the essential fact that Bell Media's work has been copied, and both of which simply implemented Trans Western's desire to produce a thicker directory than Bell Media. The Trans Western book is in no sense of the word identical to Bell Media's, but it is substantially similar. Of course, Trans Western has provided several justifications for this.

The defenses offered by Trans Western can be grouped into several general areas.

These are (I) Trans Western has not copied anything that is protected by the copyright statute; (II) Even if it has technically copied the Bell Media book, it is permissible because of the peculiar quirks of the Yellow Pages industry; and (III) Even if it has copied Bell Media's book and the copying is an infringement even in the face of Yellow Pages market standards and practices, preliminary injunction is not available for equitable reasons, including conduct on the part of Bell Media and the devastating effect that an injunction will have on Trans Western and the citizenry and businesses in Wichita.

**(I)** *Whether a Protected Work Has Been Impermissibly Copied*

**(A)** *Heading Classifications Are Uniform in the Industry*

Trans Western first argues that heading classifications are commonly taken from a "heading list" published by the National Yellow Pages Service Association (NYPSA), of which Trans Western is a member. Trans Western contends that headings are in the public domain and are incapable of copyright protection. It also asserts that no originality "resides" in the use of these headings or their alphabetical order. Trans Western does not allege, however, that it in fact obtained the headings for its prototype directory from this list. Rather, it is clear to the court that both Ms. Karwoski's testimony and the naked eye reveal defendant's true conduct. For instance, on the very first and second pages of the Yellow Pages, Bell Media has listed headings for "Abortion Alternatives Organizations" and "Abortion Services." Trans Western has both headings in its prototype directory, although neither of the headings appear in the NYPSA January, 1987 Heading List submitted by defendant. Trans Western, in a veiled attempt at originality, has thrown in a heading for "Abortion Information and Services," which is in neither the Bell Media book nor the NYPSA list, but several of the businesses or organizations listed under this heading in the prototype book include "Magill Materials Inc.," "Pioneer Materials Inc.," and "Wichita Drywall & Acoustical Supply." The facts certainly do not support Trans Western's intended inference that it used only headings that were in the public domain. On the contrary, the evidence is uncontradicted that Trans Western copied most of Bell Media's headings.

Furthermore, Trans Western copied not only the headings, but also the list of particular businesses under each heading. Even though the defendant argued that the business classifications of each subscriber is public knowledge, those businesses or Bell Media may choose listings under more than one heading. For instance, a hardware store may be listed under a number of headings for products or services. The unique arrangement of the exact businesses listed under each peculiar heading is a "compilation" that Bell Media has created, and it is clear to this court that such a compilation is protectable. The evidence readily demonstrates that defendant has essentially reproduced this compilation in its prototype.

**(B)** *Use of the Database Is Pursuant to License*

Defendant argues that it has a license to the same database from Bell Telephone that Bell Media has utilized, and that this license permits defendant to use the name, address, telephone number, and business classification of each business or organization in the Yellow Pages. Even accepting this argument as true, the evidence does not establish that Trans Western in fact utilized the database in making its book. Rather, the evidence shows that Trans Western used the Bell Media and SDS books as exclusive sources of information, even though the Bell Media is replete with copyright notices and the SDS book contained an express statement that its contents could not be reproduced without the consent of Bell Telephone. Moreover, Trans Western did not simply use those bare facts granted it by the license; it formatted those facts in a manner essentially the same as Bell Media's compilation. It appears that Trans Western knew *what* it could legally do, but simply took the shortcut and borrowed from a convenient, existing source of information, the Bell Media directory.

### (C) The Display Ads and In-Column Ads Are Owned by the Advertiser and Bell Media Cannot Prevent Their Reproduction

■ The truth of this contention is irrelevant to the court's determination. It does not matter who holds the copyright to the individual items in a compilation; the work that is protected is the arrangement of those items in a peculiar fashion. Even if it is conceded that Trans Western could reproduce the exact display advertisements in its book, this fact does not permit defendant to construct its prototype directory using essentially *only* those display ads that appear in the Bell Media book. As the Eleventh Circuit noted, Trans Western could use the identical ads that appear in Bell Media's book if the particular advertisers granted permission to do so. *Southern Bell*, 756 F.2d at 812. The evidence establishes that no such permission was obtained.

### (D) Summary

As to whether Trans Western has physically copied the Bell Media directory in compiling the prototype directory, the court finds, for the purposes of the motion for preliminary injunction, that the prototype directory is a copy in all essential respects. It uses the same headings; it includes the same businesses under those headings; it generally includes an in-column ad whenever the Bell Media listed an in-column ad; it includes a display ad when Bell Media inserted a display ad; and it copies nearly all of the information contained in those ads, as well as much of the same artwork and illustrations. Bell Media has submitted convincing evidence that the Trans Western directory prototype for Wichita, Kansas was created in derogation of plaintiff's rights under 17 U.S.C. § 106.

### (II) Whether Trans Western's Copying of Wichita Directory Is Permissible Because of Yellow Pages Industry Standards

### (A) Keying Is Both Common and Acceptable

Defendant first asserts that the practice of "keying," which it describes as "ob-tain[ing] a copy of the copyrighted dominant local directory which will be the target of competition and to input the business listing information of name, address, telephone number, and business classification from that directory into a computer database," is followed by nearly all directory companies, including Bell Media. The purpose of this, in defendant's words, is to "use that database to develop account profiles or sales lead sheets to use in contacting prospective yellow pages advertisers and to publish a competitive directory." If that is all that had occurred in the present case, we would not be having a dispute of this nature. As has been demonstrated, Trans Western did not originally use the keyed database to develop account files or sales leads. It used the information to construct a directory substantially similar to the dominant directory. Furthermore, as the plaintiff points out, the keyed database did not include the text of in-column or display ads, both of which were reproduced in the Trans Western prototype. Therefore, even if industry practice in some way affected this court's decision as to copyright infringement, the industry practice of keying does not aid defendant because the allegedly infringing work was not constructed from a keyed database.

### (B) Fair Use Defense, 17 U.S.C. § 107

Congress has provided that copying of a protected work is permissible to some extent if the copying is "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. The court need not belabor discussion on this point because defendant's pure for-profit motive in copying the Bell Media directory does not fall within the contemplated coverage of the fair use defense. This defense has been raised and rejected in similar cases, *see, e.g., Southern Bell*, 756 F.2d at 810–11, and the court finds that Trans Western's use of Bell Media's Wichita directory is not protected by the fair use doctrine.

### (C) *Copyright Protection for Yellow Pages is Narrow and Does Not Embrace Facts in the Public Domain*

Trans Western argues that only the facts and data in the Bell Media book have been copied and not the form of expression, and only the latter is protected by the copyright statutes. Defendant asserts that the only basic protection afforded Bell Media is the right to prevent someone from xeroxing the directory and using it commercially. Finally, defendant contends that because recurring material is not protected and the Bell Media directory is composed almost entirely of recurring material, no infringement has occurred.

First, the court has already discussed the fact that the form and expression of the Bell Media book has been copied by Trans Western. Second, the court does not believe that the copyright laws only provide Bell Media with the extremely limited protection that defendant desires. The substance of the Yellow Pages is not mere "facts" that deserve little more protection than the right not to be mechanically copied for profit. The components of the Yellow Pages result from years of footwork, sales efforts, goodwill, innovative graphics, and dollar investments. It is a copyrightable compilation, and an infringing competitor must not be allowed to avoid legal liability merely because it touched up its copy so as not to seem outwardly identical to the original. The law cited by defendant does not alter this conclusion. Last, the defendant has provided no basis for the court to determine which parts of the Bell Media book are new and which are republications of prior material. In any event, the court does not find this argument persuasive because a compilation such as a telephone directory must be viewed as a whole. Moreover, although Trans Western claims that Bell Telephone and not Bell Media is the holder of the copyright to much of the material in the 1986–87 Wichita and Vicinity Telephone Directory, the copyright statute permits either the legal *or the beneficial* owner of an exclusive right under a copyright to institute an action for infringement, *see* 17 U.S.C. § 501, and the court believes that at the very

least, Bell Media is the beneficial owner of the copyright privileges of the previous directories published by Bell Telephone. Nor does the fact that Bell Media, in its copyright registration, titled its work "Revised Compilation of Classified Telephone Customer Listings" persuade the court to find that its copyright is materially deficient. Whatever connotations that title might raise, it is a fact that Bell Media placed a copyright symbol on *every* page of its directory, both Yellow Pages and white pages. Trans Western was not misled by the registration form, and Bell Media's chosen title of its directory does not lessen the copyright protection.

### (D) *Summary*

The defendant has raised other arguments about how telephone directory companies commonly use the dominant directory and customer information contained therein to create a competitive directory or at least as a tool for conducting a canvass of the desired metropolitan area. The court does not find this evidence persuasive in reaching a decision on whether there has been a copyright infringement under the present facts. Trans Western has provided no legal excuse for its infringement.

### (III) *Whether Plaintiff's Conduct and the Public Interest Require Rejection of a Preliminary Injunction*

### (A) *Laches*

Defendant first argues that because plaintiff waited so long after it learned of the prototype directory to file its lawsuit, plaintiff has lost its right to a preliminary injunction. Defendant relies on a decision in which the dominant directory company waited seven months to file suit and the court denied the requested relief on that basis. *See Bell South Advertising and Publishing Corp. v. Donnelley Information Publishing, Inc.*, No. 85–3233–Civ-Scott, slip op. (S.D.Fla. Oct. 29, 1985). The evidence in the present case showed that Bell Telephone management had the prototype directory in their possession by mid- or late-December, 1986, and that a compari-

son between the two books began or reasonably should have begun sometime within a reasonable period after obtaining possession. Suit was filed on April 29, 1987, which as a practical matter foreclosed defendant from instituting changes in its method of canvassing for a book to be published in September or October of 1987.

■ The court is unwilling to deny a preliminary injunction because of laches for the following reasons. First, Bell Media had no reason to believe that Trans Western did not contact individual customers in constructing the prototype directory. As is evident from testimony from both sides, the method employed by Trans Western is innovative and new. The use of a prototype directory to promote sales has apparently never been tried. Therefore, Bell Media would have had no obvious reason to immediately scour the prototype for similarities. Second, because of the cosmetic changes made by Trans Western, it is not so obviously a copy of the Bell Media book as to put the plaintiff on legal notice that its directory had been infringed. In fact, defendant strenuously argues that the two books are substantially different. Last, the evidence indicated that it was not until early March, 1987, that Bell Media discovered the infringing nature of the prototype. They filed suit within two months of that discovery. This does not seem like an inordinate amount of time considering the unsettled nature of this area of law. Very few courts have heretofore dealt with disputes between freely competing companies in the telephonic market. Some time for factual investigation and research into the copyright laws has to be expected. The court agrees that there is some indication that this suit was not brought as soon as it possibly could have, but the evidence does not establish that plaintiff failed to assert its rights diligently so as to preclude a preliminary injunction.

### (B) Unclean Hands

■ Defendant next argues that because Bell Media is practicing the same sort of copying as defendant, it should be precluded from obtaining the equitable relief of a preliminary injunction. In particular, defendant has submitted evidence of plaintiff's introducing directories into metropolitan areas such as New York and copying the dominant directory, mistakes and all, in the effort. Even assuming this is true and perhaps even relevant to the present case, the act of a competing directory exactly reproducing an ad that appears in the dominant directory is not a copyright infringement if the competitor has permission from the advertiser. Defendant has provided no basis for a finding that Bell Media has not obtained prior permission. In addition, plaintiff has adequately demonstrated that the defense of unclean hands is available only when the plaintiff has engaged in misconduct having a direct relation to, or connected with, the litigation between the parties. *See, e.g., Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). Defendant's attempt to avoid liability based on plaintiff's conduct in other matters outside the scope of the present dispute between the parties is unavailing.

### (C) *Injury to Businesses that Purchased Advertising in Trans Western's 1987–88 Directory*

Defendant argues that if plaintiff's requested injunction is issued, those who will suffer the most are the innocent businesses who purchased advertising in the Trans Western directory and cancelled ads in the Bell Media directory. These businesses will be without Yellow Pages advertisements for nearly a year. Trans Western therefore concludes that a preliminary injunction would not be in the public interest.

Defendant raises a point that greatly disturbs the court. It is extremely unfortunate that the little guy has been trampled upon in a dispute between two large corporations.[2] The disturbing nature of this affects only the court's sympathy, however,

2. The damage may not be so drastic. As plaintiff notes, every business with a public telephone number will still be listed in its Yellow Pages, although many who may have desired an in-column or display ad will not have one.

and it does not have even the slightest influence on the correct legal decision that the facts of this case require. Any damage to the people of Wichita was wrought by defendant Trans Western's conduct. It alone chose to infringe on the rights of another in an attempt to establish an immediate competitive advantage in the Wichita telephone directory market. Most companies start at the bottom and work their way up. Trans Western, in an attempt to reach parity or even superiority in the first year, has reached for the top and ended up dragging many others down with its fall. The court cannot in any sense of fairness reward Trans Western for its efforts. An owner of a copyright has the statutory right to have its work protected and the court would be remiss in its obligation as a guardian of legal rights to allow sympathy to influence its decisions.

## STANDARDS FOR PRELIMINARY INJUNCTION

The final task is to review the standards for entering a preliminary injunction and to apply those standards to the facts of this case. In seeking a preliminary injunction, the moving party must establish:

(1) a substantial likelihood of prevailing on the merits;

(2) that the moving party will suffer irreparable injury unless the injunction issues;

(3) proof that the threatened injury outweighs whatever damage the injunction may cause the opposing party; and

(4) that the injunction, if issued, is not adverse to the public interest.

*Lundgrin v. Claytor,* 619 F.2d 61 (10th Cir.1980). *See The Kingsford Products Co. v. Kingsfords, Inc.,* No. 86–2447, slip op. (D.Kan. May 27, 1987) [Available on WESTLAW, 1987 WL 22331].

### (I) *Substantial Likelihood of Success on the Merits*

The court finds that in light of the record in this case and the supporting legal authority, plaintiff has established a substantial likelihood of success on its copyright infringement cause of action. In every essential respect, the Trans Western prototype directory is a copy of the Bell Media 1986–87 directory, both in its physical appearance and in the manner in which it was created.

### (II) *Irreparable Injury*

Defendant argues that any injury to Bell Media has already occurred since plaintiff has closed its canvass for the 1987–88 directory and cannot change anything in the book. The court finds, however, that if defendant is allowed to publish a directory derived from the use of its infringing prototype, plaintiff will suffer both long-term financial damage that is in all practical respects immeasurable and irreparable damage to intangibles such as credibility. If Trans Western is permitted to publish an immense directory that is both larger and later in time than the Bell Media book, it is no leap in logic to presume that the Trans Western directory will become the dominant directory in the Wichita area. Trans Western will be able to play upon this occurrence in future sales campaigns and gradually, if not immediately, push Bell Media into the position of second-best. The financial and tactical damage to Bell Media is both obvious and incalculable. Of course, if this had come about through legitimate free enterprise, the court would have no reason to even be discussing the matter. The potential position of superiority has been achieved through copyright infringement, however, and Bell Media must not be forced to lose face through unfair tactics.

### (III) *Threatened Injury v. Damage to Infringing Party*

The court does not believe that an injunction will drive Trans Western out of business or even out of the Wichita market. It will set the defendant back in attempting to publish a Wichita directory. It will also cause some bad feelings between defendant and those who have purchased advertising in its directory. Defendant contends that it stands to lose approximately $1 million that it has invested in the Wichita book already. The court does not find defend-

ant's argument persuasive. It will still be able to capitalize on the groundwork that it has accomplished in the Wichita area. It will also still be able to publish a Wichita directory as soon as it has legitimately sold enough advertising to make such a venture feasible. In any event, the harm to plaintiff should Trans Western be permitted to proceed with its presently scheduled directory could force it out of the Wichita market or, at the least, cause a substantial and permanent loss of business. The court finds that this aspect weighs in favor of a preliminary injunction.

## (IV) *The Public Interest*

The public interest does not rise to such a level in a suit between two telephone directory companies that it prohibits the entering of a preliminary injunction. The public has been and will continue to be served by Bell Media's Yellow Pages, so it will not be left without this service. Moreover, the court is not convinced that the absence of some or even a substantial number of in-column ads and display ads will result in harm to the public interest. There are many other mediums of advertisement. A business can get its message across through television, radio, newspapers, magazines, billboards, word of mouth, and other means. The adverse effect of having one year's worth of Yellow Page advertisements cancelled for a certain percentage of Wichita's business does not outweigh the injustice that will occur if Trans Western is permitted to complete its course of conduct. In addition, Trans Western remains free to conduct another canvass of the Wichita area and to publish a full directory, even though it may be pushed back in its time schedule. Again, the court finds that this consideration weighs in favor of a preliminary injunction.

## CONCLUSION

It having been established for the purposes of the present motion that defendant infringed plaintiff's copyrighted telephone directory, that no basis exists for this infringement to be excused, that neither plaintiff's conduct nor any injury to the public should prevent entering a preliminary injunction against defendant, and that the standards for entering a preliminary injunction have been met under these facts, the court finds that an injunction is warranted. The parameters of the preliminary injunction will be as follows:

1. The temporary restraining order prohibiting the use of the prototype directory in any manner whatsoever, and placing certain other restrictions on Trans Western will be continued in the form of the preliminary injunction. The defendant will not be compelled, however, to retrieve those copies of the prototype that have already been disseminated. The burden imposed by such a requirement far outweighs the damaging effect that the few thousand copies already in the possession of certain Wichita businesses might have upon Bell Media's interests.

2. Trans Western is enjoined from including in any directory that it publishes any advertisement solicited or sold with the aid of the infringing prototype directory.

The court recognizes the lack of direction that this second restriction affords the defendant as to how it may proceed in publishing a directory. The court has intended to make clear the fact that if, in soliciting an advertisement for its planned new directory, Trans Western salespersons were assisted in making a sale by the existence of the infringing directory, that contract is void. To the extent that Trans Western can produce a directory through legitimate means, *i.e.,* information received through its license with Southwestern Bell Telephone Company and information generated through direct contact with advertisers, and not in violation of number 2 above; this preliminary injunction in no way prohibits the publication of a Wichita telephone directory by Trans Western either in September or October, 1987, or any other time period. Furthermore, this injunction does not prohibit the keying of the Bell Media directory for the purpose of gathering source material to be used in contacting potential advertisers. The court admonishes Trans Western, however, that it will

be prepared to enlarge this injunction and impose sanctions if any subsequent directory produced for general distribution is found to be an infringement of a Bell Media copyrighted directory.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff's motion for preliminary injunction be granted consistent with this Memorandum and Order. IT IS FURTHER ORDERED that defendants' request for oral hearing be denied.