SOUTHWESTERN BELL MEDIA,
INC., Plaintiff,

v.

TRANS WESTERN PUBLISHING, INC.,
and Landmark Publishing Co.,
Defendants.

Civ. A. No. 87–2195–S.

United States District Court,
D. Kansas.

Jan. 20, 1988.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, Kan., Lawrence A. Rouse, Stinson, Mag & Fizzell, Kansas City, Mo., Jack C. Lorenz, St. Louis, Mo., Don M. Bradley, Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson, Kansas City, Mo., for plaintiff.

D.A. N. Chase, Wm. Bruce Day, Constance M. Jordan, Linde, Thomson, Fairchild, Langworthy, Kohn & VanDyke, P.C., Overland Park, Kan., John R. Cleary, Linde, Thomson, Fairchild, Langworthy, Kohn & VanDyke, P.C., Kansas City, Mo., William H. Sanders, Sr., Blackwell Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., James D. Griffin, Blackwell Sanders, Matheny, Weary & Lombardi, Overland Park, Kan., John R. Ferguson, Swidler & Berlin, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

### INTRODUCTION

Plaintiff Southwestern Bell Media, Inc. [hereinafter Bell Media] has moved for a preliminary injunction against defendants Trans Western Publishing, Inc. and Landmark Publishing Co. [hereinafter collectively referred to as Trans Western], prohibiting the latter from publication, use, or distribution of a yellow pages directory titled "Wichita Metro Area Telephone Directory, Use thru Nov 1988." Bell Media previously obtained an injunction from this court concerning Trans Western's use or distribution of an earlier prototype telephone directory. In October, 1986, Trans Western was utilizing a prototype directory as a sales aid in attempting to attract advertisers for its proposed final directory. In a published opinion, *Southwestern Bell Media, Inc. v. Trans Western Publishing Co.,*

670 F.Supp. 899 (D.Kan.1987), the court found that Bell Media had established a substantial likelihood of success concerning its claim that the Trans Western prototype was an infringement on Bell Media's copyrighted telephone directory. Knowledge of the contents of this prior decision will be assumed.

Bell Media contends that a new telephone directory being distributed by Trans Western is again an infringement of Bell Media's copyrighted directory and therefore violates the previous injunction entered by the court. Bell Media also alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a) and the common law unfair competition based on certain false or deceptive conduct of Trans Western. Bell Media seeks (1) an injunction barring further use or distribution of this new directory; (2) an injunction prohibiting Trans Western from destroying documents relevant to the present dispute; and (3) an order requiring Trans Western to retrieve every directory that has already been distributed. Bell Media also seeks sanctions based on the alleged violation of the court's prior preliminary injunction order. Trans Western denies plaintiff's contentions and asserts, to the contrary, that it endeavored to diligently follow the court's decision and in good faith constructed a telephone directory immune from any allegations of copyright infringement, unfair competition, or misrepresentations. Trans Western asserts that what the present motion really seeks is to unfairly preclude competition in the Wichita, Kansas yellow pages market, thereby perpetuating Bell Media's monopoly.

This matter was heard before the court on January 15 and 19, 1988, and the parties have filed extensive legal memoranda. The court believes that it fully understands the situation existing in the Wichita, Kansas yellow pages market and the applicable standards of law. For purposes of the present motion for preliminary injunction only, the court is prepared to enter the following finds of fact and conclusions of law.

## FINDINGS OF FACT

### 1. Creating the New Directory

Upon entry of the Court's July 6, 1987 Memorandum and Order granting a preliminary injunction, Trans Western initiated a second campaign to publish a Wichita, Kansas metro area telephone directory. The process it followed in so doing is as follows. As it had done with its infringing prototype directory, Trans Western used the 1986 Bell Media yellow pages as the source for its initial pool of potential advertisers, the Bell Media book serving as a "data base." Trans Western keyed the contents of the 1986 Bell Media book into a mainframe computer. It then set out to contact all (or as many as possible) of the approximately 14,000 businesses in the Wichita, Kansas metro area in order to obtain authorization to include those businesses in the new directory. Contact with those businesses was attempted through several avenues, principally through the efforts of a company called EKI. EKI is a St. Louis-based entity that contacts businesses which might desire a yellow pages listing or advertisement. Trans Western employed EKI to contact, by telephone, the businesses listed in the keyed data base. Trans Western gave EKI authority to attempt three telephone calls per business in order to verify information in the data base and/or gain authorization to publish an advertisement in the yellow pages. There are several obvious reasons why one phone call would not have been sufficient, such as a busy signal, disconnected number, a wrong number, no answer, answering service or machine, or the absence of the appropriate person with the power to authorize an advertisement. It would have been very valuable for the court to have had relevant testimony from an EKI representative on exactly what procedure it used to gain verification or authorization, but no such testimony was proffered. Trans Western's Vice–President for Marketing, Dennis Reimert, testified on the scope of EKI's inquiry. On Friday, January 15, 1988, during plaintiff's case, Reimert testified as an adverse witness. He stated that *if EKI obtained verification* of the name, ad-

dress, and telephone number of a business, that business was moved from the keyed data base into Trans Western's new directory, whether or not the business specifically authorized its name and/or advertisement to appear in the book. On Tuesday, January 19, 1988, during defendants' case, Reimert testified that to the best of his understanding, EKI did not move the business from the data base to the directory *unless authorization was received.* The court does not find this discrepancy significant, since direct contact was made under either situation.

The result of EKI's work was the creation of a "televerify report," a stack of printout sheets, one for each business, representing the fruit of EKI's labor. As to those entries that EKI did not move from the data base to the directory, for whatever reason, it appears that Trans Western reviewed these on a business-by-business basis and attempted to contact some of them itself. Obviously, if EKI received three busy signals and gave up trying to contact a business, Trans Western might view the business as a potential advertiser and attempt to contact it, either by phone or in person.

The cumulative effort by EKI and Trans Western to contact the businesses is referred to as a canvass. As a result of this canvass, Trans Western believed that it had the necessary revised data base to construct a new directory, consisting solely of businesses with whom personal contact had been made. Out of the pool of businesses, Trans Western sought to determine of each business whether an in-column space ad, a display ad, or a mere yellow pages listing was desired. It appears that in some instances, a Trans Western representative sat down with personnel from a given business and drew up the artwork and text for display and in-column space ads. In other instances, the business may simply have desired to use the same ad that appeared in the Bell Media book.

Defendant submitted evidence that the original data base (*i.e.,* the 1986 Bell Media book) contained 40,385 listings in the yellow pages, comprised of all listings, adver-

tisements, and trade headings. As a result of the canvass and the weeding out of listings for businesses that (1) had gone out of business; (2) expressed a desire not to appear in Trans Western's book; or (3) could not be reached for verification or authorization, the final Trans Western Wichita metro area directory had 28,415 listings, a "purge" of 11,970 listings, or about 30% of the data base.

The court has compared the 1986–87 Bell Media book and the "Use thru Nov 1988" Trans Western book, and the differences are there. The differences include: (1) The title—"Wichita and vicinity" for Bell Media, "Wichita Metro Area" for Trans Western; (2) The publisher's name—"Southwestern Bell" with the accompanying familiar Bell logo for Bell Media, and "Trans Western Publishing—A U.S. West Company" for Trans Western without inclusion of the Bell logo (despite the fact that Trans Western is a wholly-owned subsidiary of a Bell company); (3) Other information on the cover—Trans Western describes the twenty-one cities or suburbs whose listings are included in the book, and it also informs the reader that zip codes are listed inside the book and that extra copies of the directory are available at certain locations, while the Bell Media book includes no such instructive text; and (4) The color schemes are substantially different. There are similarities also, including the familiar walking fingers on both books.

As for the contents of the yellow pages, the books again contain differences and similarities. The Trans Western book includes many ads that are identical to those in the Bell Media book, but it likewise contains many ads that are completely revised or that do not even appear in the Bell Media book.

*2. Specific Allegations of Bell Media*

Although Bell Media made various allegations in its legal memoranda concerning the infringing nature of the Trans Western book, the specific charges raised at the hearing include (1) that Trans Western's 1988 book copies over one-third of the in-column space ads that appeared in the pro-

totype book despite Trans Western's not having received authorization from the particular businesses for publication of those ads; and (2) that Trans Western's book is likely to cause, and already has caused, confusion in the Wichita area concerning the publisher of the Trans Western book, this confusion being caused by either intentional or grossly negligent conduct on the part of Trans Western.

Concerning its first allegation, Bell Media claimed that it looked at 2,117 in-column space ads and found that 778 had no supporting contracts according to documents supplied by Trans Western, thereby supporting the conclusion that Trans Western copied them wholesale from the infringing prototype directory. Bell Media claimed that it studied some 124 of the ads in detail and, of those, contacted sixty-one to determine whether oral authorization had been given. In 49 cases, the advertiser stated that it had given no authorization. As a result of these and other examples of possible copying (including the reproduction of errors from the 1986 Bell Media book into the Trans Western book), a representative of Bell Media, Dennis Payne, opined that Trans western copied a large portion of its in-column space ads out of the old prototype directory (which itself constituted a near reproduction of the 1986 Bell Media book, as found by this court in its July 6, 1987 Memorandum and Order).

In response, Trans Western's testimony acknowledged that as many as 500 (by Bell Media's count, 778) in-column space ads may have been included without *specific* authorization, but Trans Western contends that (1) all or substantially all of those businesses did authorize a *listing* in the yellow pages after being personally contacted by Trans Western or EKI; and (2) the text of the in-column ads is not copyrighted, but rather is part of the public domain, and Trans Western is therefore permitted to use it. Again, Trans Western acknowledged that its book does contain some replication of the 1986 Bell Media book, but identical ads were reproduced only after some direct customer contact, either by gaining express authorization or by verifying the correctness of the infor-

mation in the ads. Finally, Trans Western admitted that some ads were included for which no authorization or verification was obtained and that such ads should not have been in the directory, but it contended that even if there were as many as 500 of such ads, the total space that they occupied in the directory amounted to 1.7% of all of the column inches in the yellow pages.

Concerning its argument relating to confusion in the Wichita yellow pages market, Bell Media relies on two elements. It first claims that the text of the Trans Western directory will lead readers to believe either that Trans Western is the same entity as Bell Media, or that Trans Western is the sole publisher of yellow pages in Wichita. Bell Media also claims that conduct by Trans Western employees in distributing the directory has led consumers to believe that the Trans Western directory replaces the Bell book or is, in fact, the *new* Bell directory.

The specific text relied upon by Bell Media includes (1) listing Trans Western under the heading "Telephone Companies" when it in fact is not a utility in the Wichita area; (2) listing only Trans Western (and excluding Bell Media) under the heading "Advertising—Directory and Guide—Yellow Pages"; and (3) in the business pages, under the listing for Southwestern Bell Telephone, including an entry "SYELLOW PAGES ADVERTISING FOR THIS DIRECTORY" and thereafter directing the reader to call Trans Western Publishing. Bell Media contends that these entries collectively constitute an effort by Trans Western to confuse the consumers and lead them to believe that Trans Western is *the* yellow pages company for Wichita, Kansas.

Trans Western denies any wrongdoing concerning the above. It submitted evidence that the "SYELLOW" was not intended as a ruse to lead readers into believing that Trans Western was the publisher of "Southwestern Bell Yellow Pages," but rather was a printer's error. Bell Media offered no evidence to dispute this. As for the inclusion of Trans Western under "Telephone Companies" and the omission of Bell Media from the heading for tele-

phone directory advertising, Trans Western alleged that Bell Media has done the precise same thing in markets where it is the intruding, non-utility yellow pages competitor, and that such a practice is a product of intense competition and does not constitute actionable wrongdoing.

The second element of Bell Media's confusion argument is that Trans Western agents made various misrepresentations concerning the identity of the Trans Western directory during the distribution process. Specifically, Bell Media offered evidence that Trans Western representatives made statements such as, "This book replaces the Bell Media book," or "This is your new directory," or "The directory is now on a different printing cycle" (apparently a justification for the "new" yellow pages coming out only months after Bell Media distributed its 1987–88 directory). Bell Media hired a surveyor who opined that the vast majority of persons in Wichita associated the yellow pages with Southwestern Bell Telephone. The surveyor also found that nearly 25% of those persons who properly answered the survey thought that Southwestern Bell Telephone was the publisher of the Trans Western directory. The theory behind Bell Media's evidence on this point was that Trans Western was trying to leech itself onto the good reputation of Bell Media in the Wichita market and lead consumers to believe that the Trans Western book was the new Bell book.

Trans Western countered that some confusion was inevitable in a market in which only one company had produced the principal yellow pages for the past several decades. Trans Western denied that it intentionally caused confusion and submitted extensive testimony on the methods it used in training distributors. Its evidence was sometimes inconsistent, but it tended to show that the distributors were told simply to ask a recipient how many phones there were in the office or residence and then leave a corresponding number of directories (or more if requested). If the distributing person was asked whose book it was, the person was to say, "This is the Trans Western book." The person was to say nothing else and was not to engage in conversation except to avoid being discourteous. The testimony was conflicting as to whether the person was to say, "This is not the Bell book," but the evidence was uncontradicted that Trans Western was to be represented as the publisher upon inquiry.

### 3. Events Leading to this Motion

Trans Western began distributing its book in late November or December, 1987. Immediately thereafter, Bell Media moved for a temporary restraining order prohibiting any further distribution. The court held a hearing on December 23, 1987, in which Trans Western represented that it had already distributed about 10% of the printed books, some 25–30,000 copies (including several to this courthouse in Kansas City, Kansas, some 150 miles northeast of Wichita). Trans Western's counsel also represented that distribution had ceased pending disposition of the motion for temporary restraining order. In lieu of entering such an order, the court accepted Trans Western's counsel's representation that no more copies would be distributed until authorization by the court. This is the status of the case today.

### CONCLUSIONS OF LAW

■ Bell Media has moved for a preliminary injunction on several grounds, including violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which states in relevant part:

Any person who shall ... use in connection with any goods ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods ... to enter into commerce, ... shall be liable to a civil action ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

Bell Media also claims that Trans Western has violated the previous injunction and has engaged in unfair competition.

Even if the court believes that Bell Media has presented sufficient evidence to prevail

on one or more of its claims before the ultimate factfinder, the issue before the court is the propriety of a preliminary injunction. In this regard, the court finds that the facts are in a substantially different posture than those before the court in June and July, 1987.

The prototype directory that was found to be an infringement of Bell Media's copyright was almost an identical copy of the Bell Media 1986 directory. It appeared that Trans Western had taken the Bell Media directory and simply altered the format and deleted some material in producing its own directory. The evidence established that little direct advertiser contact had occurred. The prototype was a wholesale copy of the Bell Media book. In the earlier Memorandum and Order, the court stressed that although the reproduction of specific, noncopyrighted advertisements was not prohibited, the republication of such ads en masse without authorization from the advertiser constitutes a copyright violation. Under the present facts, it is clear to the court that Trans Western has attempted to follow the letter of the court's directive, *i.e.*, that it obtain *authorization* from the advertisers or otherwise do its own legwork before inserting an ad, thereby creating a directory containing entries that are there because someone requested that they be there.

The key legal conclusion that the court intended to make in the earlier order deserves mention here:

> *The information and design of that information contained in a telephone directory may be in the public domain or the property of the advertiser,* but the effort involved in preparing artwork and layout, and in the selection, compilation and arrangement of the information contained therein constitutes a work of authorship subject to copyright protection.

670 F.Supp. at 899 (quoting *Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801, 812 (11th Cir.1985) (emphasis in original)). The court believes that Trans Western has sufficiently established that its present directory is a product of its own

effort. The evidence showed that although Trans Western began with the same data base used for the prototype directory, this time it endeavored to use that data as a *starting point* instead of a *final product.* It took the data, contacted businesses, drew up new contracts, created new ads, and deleted a substantial portion of the data base because it could not obtain proper authorization for publication of certain ads.

Trans Western could not deny that its book contained unauthorized ads and listings, but the evidence showed that Bell Media's book (as well as all directories, for that matter) contained similar unauthorized material. The court does not believe that Bell Media proved any willfulness involved in including unauthorized ads, nor does the number of such ads constitute a statistically significant portion of the directory. The court will not require a flawless effort by Trans Western, but rather a good faith, substantially complying effort. Therefore, the court must conclude that Bell Media has not established a violation of the court's preliminary injunction issued July 6, 1987.

■ Concerning whether Bell Media established a substantial likelihood of success on the merits of its Lanham Act claim, Chief Judge Earl O'Connor of the District of Kansas has recently had the occasion to summarize the elements of a claim under 15 U.S.C. § 1125(a):

> To establish a violation under section 1125(a), plaintiff must show the following: (1) defendant used a symbol falsely describing an article; (2) defendant caused such article to enter commerce; and (3) plaintiff was damaged by the use of such false description.... Plaintiff must also be able to show that the description or representation is likely to cause confusion.

*Polo Fashions, Inc. v. Diebolt, Inc.,* 634 F.Supp. 786, 789–90 (D.Kan.1986) (citations omitted). Regardless whether Bell Media has established (1)–(3), the court finds that under the applicable standard of proof, Bell Media has not established a substantial likelihood of success concerning the re-

quirement that the description or representation *cause confusion*. The confusion-causing element under these facts is the presence of more than one directory. Consumers have been receiving only one major directory for a long time, the new directory typically arriving at intervals of at least a year. When the Trans Western directory hit the streets far less than one year after the new Bell Media directory, consumers were understandably confused. The confusion does not stem from actionable conduct by the defendant. It has clearly informed the public that it is "Trans Western Publishing," and the court perceives no duty to inform every user that Trans Western has no relationship with Bell Media.

The specific allegations of misleading text in the Trans Western directory do not change the court's finding. None of these constituted *false* descriptions or representations. To be sure, they represent sharp competitive conduct, but at least for purposes of a preliminary injunction, the court is not prepared to say that they constitute a violation of the Lanham Act.

As to the oral misrepresentations alleged by Bell Media, if these ever occurred, they appear to have been very isolated and beyond the knowledge or contemplation of Trans Western management. Again, the court does not wish to preclude any theory from Bell Media as to the ultimate trial in this lawsuit, but a preliminary injunction cannot rest on the affidavits of two or three persons who claim that they were misled into believing that the Trans Western book is the new Bell Media book. For these same reasons, the court does not believe that Bell Media's allegation of unfair competition warrants an injunction.

Although the court does not wish to devote a great deal of further discussion to this matter, it should also be noted that the substantial harm that will accrue to Trans Western and its advertisers upon entry of a preliminary injunction militates against such an order. Some businesses have chosen only to advertise in the Trans Western book (although a listing for that business would probably be included in the Bell Media book). These businesses would be locked out of the yellow pages medium for at least three months. Furthermore, an injunction may sound the death knell for Trans Western in the Wichita market, both because of the financial strain and the loss of credibility. Finally, Bell Media still has its damage suit as a remedy for any wrongdoing by Trans Western. These grounds alone are not enough to prevent an injunction, but they certainly add to the court's belief that an injunction is improper in the present situation.

### CONCLUSION

Based on all of the above, the court finds that a preliminary injunction is not warranted. The court wishes to stress that it in no way intends to preclude Bell Media from asserting these theories of recovery in the ultimate trial. The court also wishes to re-emphasize that it stands ready to provide any additional equitable relief should Bell Media become aware of unfair practices or other improprieties. In particular, Trans Western should know that it must be especially careful to avoid oral representations, by it or any of its agents or employees, that falsely create the impression that the Trans Western book replaces or is in any way associated with the Bell Media book.

For various reasons, the court desires that Trans Western keep its voluntary cessation of deliveries of the new directory in force until seven (7) calendar days from the date of this Order. The Clerk of the District Court also wishes to inform the parties that they should retrieve the voluminous exhibits submitted during the hearing on the preliminary injunction.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff's motion for preliminary injunction be denied.