**BELLSOUTH ADVERTISING & PUBLISHING CORPORATION, Plaintiff–Counterdefendant,**

v.

**DONNELLEY INFORMATION PUB- LISHING, INC., Defendant–Counterclaimant,**

v.

**BELLSOUTH CORPORATION and Southern Bell Telephone and Telegraph Company, Additional Counterdefen- dants.**

No. 85–3233–CIV.

United States District Court, S.D. Florida.

Oct. 27, 1988.

**1552**

Anthony B. Askew, Robert E. Richards, Stephen M. Schaetzel, Jones, Askew & Lunsford, Atlanta, Ga., Eric B. Meyers, Stephen B. Gillman, Shutts & Bowen, Miami, Florida, for BellSouth Advertising & Pub. Corp.

King & Spalding, Atlanta, Ga. and Shutts & Bowen, Miami, Fla., for BellSouth and Southern Bell Tel. and Tel. Co.

Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, Fla., for Donnelley Information Pub., Inc.

## AMENDED MEMORANDUM OPINION

SCOTT, District Judge.

### I. INTRODUCTION

THIS MATTER is before the Court on the parties' Motions and Cross–Motions for Summary Judgment. Plaintiff/Counter–Defendant BellSouth Advertising and Publishing Corporation's ("BAPCO") amended complaint against Defendant/Counterclaimant Donnelley Information Publishing, Inc. ("Donnelley") alleges copyright infringement, trademark infringement and unfair competition arising from Donnelley's publication and distribution of a classified advertising directory in South Florida. In its answer, Donnelly counterclaims against BAPCO, as well as Southern Bell Telephone and Telegraph Co. ("Southern Bell") and BellSouth Corporation ("BellSouth"), alleging that Counterdefendants illegally monopolized and attempted to monopolize the market for advertising directories in certain parts of Florida, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Florida Statutes, § 542.19. After full and complete discovery, the voluminous record is replete with exhibits and depositions. The issues have been extensively briefed and are ripe for disposition.

### II. FACTS AND PROCEDURAL POSTURE

In accordance with the "Plan of Reorganization and Divestiture" approved on August 5, 1983, by the United States District Court for the District of Columbia, American Telephone & Telegraph Company ("AT & T") was divided into seven regional companies. BellSouth is one of the seven regional companies and is the holding company for the stock of Southern Bell. Following the divestiture of AT & T, BellSouth created BAPCO as a wholly-owned subsidiary for the purpose of preparing, publishing and distributing telephone directories. *See generally Western Union Tel. Co. v. F.C.C.*, 815 F.2d 1495 (D.C.Cir.1987); *GTE Service Corp. v. F.C.C.*, 782 F.2d 263 (D.C.Cir.1986).

On December 30, 1983, BellSouth Advertising and Publishing Corporation ("BAPCO")[1] and Southern Bell entered into an agreement by which Southern Bell granted

---

**1.** BAPCO is a corporation organized and existing under the laws of the State of Georgia, having its principal place of business at Atlanta, Georgia.

to BAPCO the sole right to publish a classified advertising directory for the greater Miami, Florida area.[2] Pursuant to this agreement, BAPCO published and distributed a classified advertising directory known as the "1984 Miami Yellow Pages".[3] Southern Bell provided BAPCO with listing data for all new, changed and disconnected telephone subscribers, along with data for each foreign listing.[4] Additionally, BAPCO owns a valid copyright in the 1984 Greater Miami classified telephone directory.[5]

Following publication of the 1984 Miami Yellow Pages, Donnelley began the promotion and sale of classified advertising in a competitive classified directory for the Greater Miami area (hereinafter the "Donnelley Directory"). On August 23, 1984, Mr. William Bak, then Executive Vice President of Reuben H. Donnelley Corporation,[6] wrote to BAPCO requesting information about how Donnelley could obtain "listings" in connection with its own directory activities. Exhibit B to Mitchell Affidavit.

Following those discussions, Southern Bell entered into four business agreements with Donnelley for the publication and distribution of a competing classified advertising directory in the Miami area through which Southern Bell provided Donnelley with the name, address, and telephone number of its relevant business subscribers. This information is the same non-confidential business subscription information that Southern Bell provides to all similarly situated independent publishers.[7]

On October 2, 1985, BAPCO filed suit against Donnelley alleging three causes of action: (1) infringements of BAPCO's copyrights in the 1984 Miami Yellow Pages; (2) trademark infringement; and (3) unfair competition.[8] BAPCO moved for a preliminary injunction on the copyright count, requesting that distribution of the Donnelley directories be prohibited. An evidentiary hearing was held in which substantial evidence was introduced. Donnelley neither disputed the validity of BAPCO's copyright registration for the 1984 Miami Yellow Pages nor denied obtaining listings and advertisements from the 1984 Yellow Pages in the preparation and publication of Donnelley's Miami North and Miami South classified telephone directories.

---

**2.** Under the terms of the agreement between BAPCO and Southern Bell, BAPCO is engaged in "creating, compiling, publishing and distributing telephone directories and classified directories in the State of Florida, particularly the Greater Miami area." Amended Complaint, page 3.

**3.** The directories were distributed in the following format:
(a) Greater Miami 1984–85 Yellow Pages— Vol. A–L
(b) Greater Miami 1984–85 Yellow Pages— Vol. M–Z.

**4.** As per the terms of the agreement, Southern Bell provides BAPCO with information concerning its subscribers. Southern Bell obtains information from a new business telephone subscriber, which includes: (a) name; (b) name of business; (c) place of business; (d) directory address; (e) billing address; (f) desired type of phone equipment; (g) quantity of telephone books desired; (h) information about the number of jacks on the premises to facilitate installation; (i) number of business lines desired; (j) credit information; (k) remote call forwarding information; (*l*) long distance carrier desired; and (m) desired "Yellow Pages" heading. Mitchell Affidavit, para. 5.

**5.** BAPCO published the 1984 Miami Yellow Pages with an appropriate copyright notice therein and otherwise complied in all respects with the applicable copyright laws. On October 10, 1984, BAPCO obtained, through deposit and registration of the works, federal registration of the copyright for the 1984 Miami Yellow Pages and has received from the Register a Copyright Certificate of Registration Nos. TX 1–425–775 and TX 1–425–783.

**6.** Mr. Bak is currently the president of Donnelley.

**7.** There are fifty-seven (57) such license agreements now in effect.

**8.** Donnelley did not request from Southern Bell any additional information until *after* BAPCO filed its Complaint, Born Affidavit, paras. 71–20, whereupon Donnelley sent a letter to Southern Bell on November 8, 1985, demanding comprehensive access to numerous catagories of information never before requested. Exhibit E to Born Affidavit. Donnelley's letter demanded the identical access to Southern Bell's subscriber information, both in form and content, that Southern Bell provided to BAPCO. The letter asserted that such identical access was "essential" for Donnelley to publish a classified directory. Donnelley also demanded on-line computer access to Southern Bell's subscriber data bases.

Donnelley's defense was essentially threefold: First, Donnelley alleged that BAPCO had purposely delayed filing the case until the eve of publication and, therefore, the alleged injury was not irreparable; second, Donnelley alleged unclean hands and antitrust violations by BAPCO, Southern Bell, and BellSouth; and third, the copyright laws did not prevent Donnelley from obtaining the listings and advertisements from BAPCO's copyrighted telephone directories.

The Court agreed with Donnelley's argument that "BAPCO's delay of over seven months in seeking injunctive relief [was] in conflict with its allegations of an urgent need to prevent irreparable injury." [9] Accordingly, BAPCO failed to meet its burden of persuasion that it would suffer irreparable injury sufficient to warrant the granting of an injunction.[10]

9. Order, dated October 31, 1985, page 6. As stated by the Court:
   During the course of the preliminary injunctive hearing, BAPCO failed to introduce any competent evidence to meet the "irreparable injury" prerequisite. BAPCO's references to irreparable harm were limited to argument of counsel. Conversely, the harm to Donnelley is real and imminent. Donnelley has invested literally millions of dollars and thousands of personnel-hours in its directory. Donnelley's very business reputation is at stake if the directory is not published the week of November 4, 1985.

10. The Court, *sua sponte*, stayed execution of its Order denying preliminary injunctive relief for one (1) week in order to permit BAPCO an opportunity to perfect an appeal to the Eleventh Circuit. BAPCO filed its Notice of Appeal on October 31, 1985. On November 15, 1985, BAPCO moved to dismiss the appeal pursuant to Rule 42(b) of the Federal Rules for Appellate Procedure, which was entered by the Clerk of Court on November 25, 1985.

11. According to the Amended Complaint, Donnelley used the 1984 Miami Yellow Pages in violation of the copyright laws of the United States in the preparation of the Donnelley Directory and in the preparation of materials for use in the solicitation of advertisements for the Donnelley Directory. Specifically, BAPCO alleges that Donnelley, without permission "made or required, at least one complete, unauthorized copy of the 1984 Miami Yellow Pages which was made by copying the work, or substantial portions thereof, into a computer data base so that said copy is in machine-readable form in collat-

Before Donnelley answered the original complaint, BAPCO amended its complaint, expanding the allegations of copyright infringement to include all BAPCO copyrighted classified telephone directories from which Donnelley had obtained listings and advertisements.[11] The amended complaint was filed November 7, 1985. Donnelley answered, naming BAPCO, Southern Bell, and BellSouth, as Counterdefendants and alleged: (1) unlawful monopolization; (2) unlawful attempt to monopolize; and (3) invalid trademark registrations.[12]

Following extensive discovery, the parties submitted voluminous motions for summary judgment—to wit:

(1) Donnelley moved for Summary Judgment on BAPCO's copyright claims.

(2) Donnelley moved for partial Summary Judgment on BAPCO's trademark claims;

able machine memory and/or recorded on magnetic media." Amended Complaint, page 9. Further, BAPCO alleges that "Donnelley unlawfully used said machine-readable copy of the 1984 Miami Yellow Pages, and/or hard copies thereof, in whole or in part, to contact the listed businesses and advertisers in the BAPCO 1984 Miami Yellow Pages and request that they place the same or substantially similar listings and advertisements in the Donnelley Directory. Specifically, ... Donnelley used said machine-readable copy of the 1984 Miami Yellow Pages to generate sales lead sheets." *Id.* Finally, BAPCO alleges that Donnelley's use of the phrase "Yellow Pages" and the "Walking Fingers" logo is misleading to the public and violates BAPCO's registered trademarks.

12. According to Donnelley's allegations, BAPCO, Southern Bell, and BellSouth have deliberately acquired and unlawfully maintained market power in the classified directory market by using their market power to exclude Donnelley and other potential competitors from the monopolized market in violation of federal and state antitrust laws. Specifically, Donnelley alleges that "the license agreement offered by Southern Bell is a refusal to provide information known by it to be essential to the sale of advertising, compilation, publication and distribution of a fully competitive classified advertising directory." Answer, page 20.
   Additionally, Donnelley asserts that the Counterdefendants and/or their predecessor-in-interest, AT & T, have abandoned the "Walking Fingers" logo, which has ceased to function as a trademark. Answer, page 26.

(3) Donnelley moved for Summary Judgment seeking to cancel registration of the "Walking Fingers" logo;

(4) BAPCO moved for Summary Judgment on the copyright claims.

(5) BAPCO, BellSouth, and Southern Bell moved for Summary Judgment on Donnelley's antitrust counterclaims and defenses.

Oral argument was originally conducted on Friday, October 3, 1986. At the close of argument, the Court inquired as to whether discovery was complete. The parties indicated that "key" discovery needed to be taken. In view of these representations at oral argument, the Court allowed additional discovery. The parties were also granted leave to file supplemental memoranda and exhibits relating to their respective motions. In order to assist the Court in concluding this matter, the parties reargued their respective motions on May 22, 1987. Each motion as it relates to a substantive area of the law will be addressed independently.

### III. LEGAL DISCUSSION

### A. COPYRIGHT

BAPCO moves for summary judgment [13] on count one of the amended complaint, arguing that Donnelley violated the copyright laws by reproducing the 1984 Miami Yellow Pages. As direct evidence of copying, BAPCO submits that Donnelley's own admissions, as well as the testimony of Donnelley's own employees, clearly establish that Donnelley actually copied name, address, telephone number and classified heading from the 1984 Miami Yellow Pages on to sales lead sheets and then into the Donnelley directories. As indirect evidence of mass copying, BAPCO argues that the 1984 Miami Yellow Pages were easily accessable to Donnelley, there being over 1,100,000 copies in circulation. Additionally, BAPCO asserts that the Donnelley sales

lead sheets and the Donnelley directories are substantially similar to the 1984 Yellow Pages, relying mainly on the presence of "common errors" between the two publications.

In its Cross–Motion for Summary Judgment and Opposition to BAPCO's Motion for Summary Judgment, Donnelley's principal argument is that the names, addresses, and telephone numbers as they appear under yellow page headings in BAPCO's classified directories are not copyrightable subject matter. "Donnelley bases its claim of non-infringement on the contention that the particular material it has copied, because of both its nature and origin, is not protected by BAPCO's copyright." Concise Statement of Donnelley Information Publishing, Inc., Pursuant to Order of April 3, 1987, page 4.

To prevail on a claim of copyright infringement, a copyright owner must establish ownership of a valid copyright in the work and copying of that work by the defendant. *Donald Frederick, Evans and Assoc., Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986); *Southern Bell Tel. & Tel. v. Assoc. Tel. Directory Publishers,* 756 F.2d 801, 810 (11th Cir. 1985) (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821 (11th Cir.1982); *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365 (5th Cir.1981)). Further, the "mere use of information contained in a directory without a substantial copying of the format does not constitute infringement." *Miller,* 650 F.2d at 1369–70; *New York Times Co. v. Roxbury Interface, Inc.,* 434 F.Supp. 217 (D.N.J.1977). Thus, there are three elements that must be established in order to show copyright infringement. These elements include:

(i) ownership of a valid copyright due to creation of an original work of authorship;

13. Summary Judgment has specifically been found to be appropriate for deciding issues of copyright infringement. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 200 U.S. P.Q. 65 (5th Cir.1978); *Chess Music, Inc., v. Tadych,* 467 F.Supp. 819, 204 U.S.P.Q. 516, 518 (E.D.Wis.1979); *see also Midway Mfg. Co. v. Bandai–American, Inc.,* 546 F.Supp. 125, 216 U.S.P.Q. 812, 822 (D.N.J.1982); *Knickerbocker Toy Co., Inc. v. Genie Toys, Inc.,* 491 F.Supp. 526, 211 U.S.P.Q. 461 (E.D.Mo.1980).

(ii) defendant's copying from plaintiff's work; and

(iii) the defendant's copying of enough protected expression to constitute an unlawful appropriation, i.e., a substantial and material taking.

When there is substantial copying, the alleged infringer may raise the issue of fair use, which is a defense in which various factors are balanced to determine if the defense is justified. *Assoc. Tel. Directory,* 756 F.2d at 810.

### 1. *Ownership of a Valid Copyright*

Directories such as the 1984 Miami Yellow Pages at issue in this case may receive copyright protection as "literary works" under 17 U.S.C. § 101 (1977). *Assoc. Tel Directory,* 756 F.2d at 809. *Southwestern Bell Media, Inc. v. Trans Western Publishing, Inc.,* 670 F.Supp. 899 (D.Kan.1987) (citing *Hutchinson Telephone Co. v. Frontier Directory Co.,* 770 F.2d 128 (8th Cir. 1985)); *Rural Tel. Service Co. v. Feist Publications, Inc.,* 663 F.Supp. 214, 218 (D.Kan.1987). This is true despite the fundamental principle of copyright law that facts cannot be copyrighted. *See* 17 U.S.C. § 102(b); *Miller,* 650 F.2d at 1368–69. Directories are also "compilations," which are defined as follows:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. 17 U.S.C. § 101.

Thus, it has been held that,

> a telephone directory compilation whose components are comprised exclusively of information in the public domain can be protected by the copyright laws only as to the selection and arrangement of the compilation, the work as a whole, and not as to the preexisting information.

*Assoc. Tel. Directory,* 756 F.2d at 810.

Directories in particular are afforded special protection as to the selection and arrangement of factual material notwithstanding the difficulty in reconciling this position with the principle that facts are not copyrightable. *See Miller,* 650 F.2d at 1370.

BAPCO published the 1984 Miami Yellow Pages with the appropriate copyright notice on each page. Furthermore, BAPCO filed for and received from the Registrar of Copyrights Certificates of Copyright Registration Nos. TX 1–425–775 and TX 1–425–783 for the 1984 Miami Yellow Pages. *See infra* note 5. Moreover, Donnelley does not contest the validity of BAPCO's copyrights of its classified telephone directories. In response to BAPCO's Second Set of Interrogatories, Donnelley stated that it "does not contend that BAPCO's compilation copyright in the 1984 Miami Yellow Pages is invalid." Answer to Interrogatory No. 20, page 10.

The gravamen of Donnelley's argument of non-infringement is that the particular material it has copied, because of both its nature and its origin, is not protected by BAPCO's copyright. Concise Statement of Donnelley, pursuant to Order of April 3, 1987, page 4. Donnelley's fundamental claim, therefore, is that BAPCO did not select, coordinate or arrange the collection of facts to the extent that the directory became an original work of authorship. Although Donnelley's claim is well briefed, it does not apply to the facts of this case and fails to adequately distinguish case law binding on this Court.

This case is controlled to a large extent by *Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801 (11th Cir.1985). In that case the court held that Southern Bell owned a valid copyright in the 1982 Atlanta Yellow Pages and enjoined the defendants from using photocopies of that compilation. The 1984 Miami Yellow Pages were compiled in an identical manner as the 1982 Atlanta Yellow Pages.[14]

---

**14.** The court finds no material difference in the photocopying which took place in *Assoc. Tel. Directory* and the copying resulting from the input into a computer of every name, address, telephone number and associated classified heading for every listing in BAPCO's directory. Donnelley prepared sales lead sheets and its directories from these computer tapes. Al-

Second Affidavit of Bob Johnson at p. 1. Donnelley has not shown any facts which contradict this holding. Thus, the opinion by the Eleventh Circuit in *Assoc. Tel. Directory* that the 1982 Atlanta Yellow Pages were validly copyrighted is extremely persuasive authority that the 1984 Miami Yellow Pages are also validly copyrighted.

Both parties have submitted a multitude of authority regarding the legal standards by which compilations are to be measured under Section 101 of the Copyright Laws. Some courts have applied a "sweat of the brow" test to determine whether a particular compilation is copyrightable.[15] Under this test the factual compilations of a copyright owner are protected in that a subsequent compiler of such facts must do his own independent research and expend his own labor and effort. Other courts apply a "selection, coordination or arrangement" test in assessing copyrightability.[16] Although the underlying facts are unprotectable under this test, the compilation as a whole is protected as to the selection and arrangement of such facts. Although the Court prefers the "selection, coordination or arrangement" test, it is not clear which test the Eleventh Circuit adopted in *Assoc. Tel. Directory*.[17] It is clear, however, that BAPCO's directory meets both tests.[18]

BAPCO collects and assembles preexisting material in the form of names, addresses, telephone numbers and classified headings. The process begins when Southern

Bell sends BAPCO the name, address, telephone number (and sometimes a free listing classification) from business telephone subscribers when they obtain service from Southern Bell. BAPCO receives this information randomly and not sorted by geographical area, area code or telephone exchange. BAPCO then performs various acts of selection, coordination and arrangement of this information, which lead to the final organized Yellow Pages.

BAPCO performs various acts of selection which contribute to the publication of the directory. These acts include selection of the geographical area to be covered by a directory; selection of the number of free listings to be provided; selection of the requirement that businesses use business telephone service in order to advertise in the BAPCO directory; selection by the sales force of the headings which will be recommended to a customer; selection of the classified headings which will be available for a particular directory; selection of the headings under which an advertiser's listing will appear; selection of the criteria under which advertisers may or may not be permitted to advertise under headings not related to their business; selection of the number of free listings to be provided telephone subscribers; selection of customers who will be contacted by premise sales personnel, telephone sales personnel and no contact; selection of the date of commencement of a sales campaign; and selection of

---

though keying information into a computer and printing it out may not appear as egregious as photocopying, BAPCO's copied listings and headings still make up a substantial majority of Donnelley's directories. There is no meaningful distinction between photocopying material and inputing material into a computer before printing it out.

**15.** Cases applying the "sweat of the brow" test include: *Hutchinson Telephone Co. v. Fronteer Directory Co.*, 770 F.2d 128 (8th Cir.1985); *Schroeder v. William Morrow & Co.*, 566 F.2d 3 (7th Cir.1977).

**16.** Cases applying the "selection, coordination or arrangement" test include: *Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501 (2d Cir.1984); *Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir.1984).

**17.** The Court stated:

Our inquiry here does not require that we choose between a limited or more expansive standard of originality under the Act. It is enough that originality is to be tested by the nature of the selection and arrangement of the preexisting material in the compilation. *Assoc. Tel. Directory*, 756 F.2d at 809 n. 9. But, without adopting a test, the Court concluded that the 1982 Atlanta Yellow Pages met the more vigorous "selection, coordination or arrangement" test.

**18.** BAPCO and its affiliations have expended great efforts in collecting, assembling, compiling and publishing its directors. *See* Affidavit of Bob John; Second Affidavit of Bob Johnson. Donnelley does not claim to have used its own efforts in compiling the material published in its directory. There is no doubt, therefore, that BAPCO has met the "sweat of the brow" test.

the date of closing the directory. *See* Second Affidavit of Bob Johnson.

BAPCO also engages in acts of coordination and arrangement which aid to the Yellow Pages publication. BAPCO coordinated the headings. In addition, BAPCO arranged these headings, along with all of the listings under a particular heading, in alphabetical order. BAPCO chose to coordinate and arrange its directory in this manner from other alternatives. For example, BAPCO could have chosen to arrange its headings according to the numbers of advertisers or to arrange its listings under headings according to which listing had been advertising under that heading for the longest period of time.

■ Donnelley does not dispute that BAPCO performs these acts. The dispute centers only on the legal effect of such acts. All of BAPCO's acts contribute to the publication process and are identical to those carried out in aiding the publication of the 1982 Atlanta Yellow Pages. Because the opinion in *Assoc. Tel. Directory* held the Atlanta Yellow Pages to be validly copyrighted and because BAPCO has created a unique directory due to its method of selecting, coordinating and arranging its material, the Court concludes that BAPCO's compilation is an original work of authorship which is subject to a valid copyright.[19]

### 2. *Defendant's Copying From Plaintiff's Work*

This element of copyright infringement may be shown directly by an admission of copying by the defendant, or indirectly by proving access to the directory and substantial similarity between the plaintiff's and defendant's work. *Rural Tel. Ser. Co.*

*Inc. v. Feist Publications, Inc.*, 663 F.Supp. 214 (D.Kan.1987); *Central Tel. Co. of Virginia v. Johnson Publishing Co.*, 526 F.Supp. 838, 843 (D.Colo.1981). It is well-settled that one of the most significant evidences of copying is the existence of common errors between the two directories. *Rural Telephone*, 663 F.Supp. at 218. *See also Fin. Information, Inc. v. Moody's Investors Serv., Inc.*, 599 F.Supp. 994, 996 n. 3 (S.D.N.Y.1984); *Central Tel. Co.*, 526 F.Supp. at 844.

There does not appear to be any dispute that Donnelley copied from BAPCO's copyrighted directory. Donnelley has never disputed "that it has copied material from BAPCO's directories." Concise Statement of Donnelley, Pursuant to Order of April 3, 1987, p. 4. This concession is buttressed by substantial facts of copying in the record.

Donnelley obtained copies of the 1984 Miami Yellow Pages and coded these pages for copying.[20] The coded pages were then sent to Appalachian Computer Services, Inc. ("Appalachian"), a data entry company located in London, Kentucky.[21] Appalachian reproduced in machine (computer) readable form every paid listing and every advertisement in the 1984 Miami Yellow Pages by "keying" (reproducing) into a computer data base the following information: name, address, telephone numbers, the code corresponding to the classified heading, a code corresponding to the unit of advertising and a code for the directory from which it came. This information was stored on magnetic tape and sent to Donnelley.

Donnelley then edited, compiled and organized the information on the magnetic tape, adding heading codes that corre-

---

**19.** Although not dispositive of the issues here we note parenthetically that Donnelley's acts of copying would have violated Donnelley's copyright notification in its own copyrighted directories. Deposition of Ernest J. Martin at 407, 410–11, 435.

**20.** Copies of the 1984 Miami Yellow Pages were cut apart and each sheet was individually mounted on a stiffer backing sheet for ease of handling. Each mounted sheet was then coded in red ink by Donnelley personnel. This coding

procedure involved marking each classified heading with a corresponding code and an advertising code.

**21.** Appalachian specialized in converting data from paper or hard copy form to a computer or machine readable form by typing or "keying" data from the 1984 Miami Yellow Pages which appears on the paper into a computer terminal which then stores that computer data in magnetic form in a storage media, such as magnetic tape. *See* Appalachian Deposition, pages 10–17.

sponded to the BAPCO classified heading. Upon completing this process, Donnelley had recorded on magnetic tape the name, address, telephone numbers, classified heading, unit of advertising and directory source from every paid listing and every advertisement in the 1984 Miami Yellow Pages. From this computer data base, Donnelley printed sales lead sheets, containing telephone numbers for every paid listing and advertisement in the 1984 Miami Yellow Pages. Collectively, the sales lead sheets constitute a reproduction of substantially the entire 1984 Miami Yellow Pages in inverted or criss-cross form. All of this information from the 1984 Miami Yellow Pages and/or sales lead sheets was then copied into the Donnelley directories and distributed in the Miami Area. A comparison of the two (2) directories reveals that Donnelley used a format nearly identical to that used by BAPCO. *See* Exhibit P and P Enlarged to BAPCO's brief.

Further evidence of copying by Donnelley is the presence of "common errors." [22] There are as many as thirty-seven (37) erroneous listings in the Donnelley directories which are identical to those in the 1984 Miami Yellow Pages.[23] Donnelley has offered no evidence to refute the fact that it copied BAPCO's directory. Accordingly, the Court gleans from the record, three acts of copying. These include keying the information into the computer, preparing the sales lead sheets and publishing the Donnelley directories.

### 3. *Substantial Copying of Plaintiffs Work by Defendant*

■ As mentioned above, Donnelley does not contest that it copied every name, address, telephone number and classified heading from BAPCO's directories. Certainly the wholesale copying of every word in BAPCO's directory constitutes substantial copying. In addition, it does not matter that Donnelley did not produce an exact duplicate of BAPCO's directories. For example, in *Southwestern Bell Media v. Transwestern Publishing, Inc.,* 670 F.Supp. 899, 905 (D.Kansas 1987) the Court concluded that Transwestern infringed Bell Media's copyright despite noting that: ·

> In most of the prior federal court decisions dealing with copyright infringement in the area of telephone directories, the guilty party simply photocopied the existing directory or produced an identical listing of white pages, which is a much clearer case of copyright infringement. In the present case, Trans Western did not produce an exact, or even nearly exact, copy of the Bell Media book. In a nutshell, Trans Media took essentially the same information contained in Bell Media's Yellow Pages and put it in a slightly different format.

Similarly, although Donnelley's directory is not identical to BAPCO's directory, the material was copied and used to produce a directory substantially similar in both content and format. *See* Affidavit of Barbara Wiggs; Testimony Gerald Brown on Oct.

---

**22.** *See Rural Telephone,* 663 F.Supp. at 218; *Fin. Information,* 599 F.Supp. at 996 n. 3; *Central Tel. Co.,* 526 F.Supp. at 844.

**23.** Illustrative examples of erroneous listings appearing in both the 1984 Miami Yellow Pages and the Donnelley Miami Directories are the following:

(1) On page 373 of the 1984 Miami Yellow Pages, "Fort Lauderdale News" is listed, erroneously, under the heading "Balancing Equipment". This identical listing for "Fort Lauderdale News" also appears under the heading "Balancing Equipment" in the Donnelley Miami North Directory at page 132. Copies of the pages from the 1984 Miami Yellow Pages and the Donnelley Miami Directories are attached to the second Affidavit of Barbara J. Wiggs as Exhibits 4 and 6 respectively with the subject listings highlighted in green. This entire list-

ing is incorrect in both directories. Obviously the Fort Lauderdale News should not be listed under "Balancing Equipment", a heading which is related to the balancing of automobile tires.

On page 1433 of the 1984 Miami Yellow Pages "Flash Courier Systems" is listed even though the subscriber's telephone was disconnected before January 1, 1984. This identical listing appears in the Donnelley Miami North directory at page 466. Copies of the pages from the 1984 Miami Yellow Pages and the Donnelley Miami North directory are attached to the Second Affidavit of Barbara J. Wiggs as Exhibits 37 and 39 respectively with the subject listing highlighted in green. The entire listing is incorrect in both directories. Furthermore, the listing was a "free listing" in the 1984 Miami Yellow Pages.

10, 1985. The Court easily concludes that such conduct constitutes substantial copying.[24]

### 4. *Fair Use Defense*

Donnelley argues that even if its copying constitutes copyright infringement, Donnelley's actions should be excused under the doctrine of "fair use." At the minimum, Donnelley claims that summary judgment is improper because of the existence of numerous material issues of fact raised by the fair use defense.

The fair use defense is a narrow exception to the Copyright Act which permits the use of copyrighted material under certain circumstances without the owner's consent. Fair use is an equitable rule of reason which must be decided on a case-by-case basis. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984). *See also Harper & Row Publishers Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Fair use presents a mixed question of law and fact. *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230; *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1495, n. 8 (11th Cir.1984). The burden of proving this defense is on Donnelley, the party asserting it. *Assoc. of Amer. Medical Colleges v. Mikaelian*, 571 F.Supp. 144, 151 (E.D.Pa.1983).

■ The fair use doctrine was judicially created and then codified by the Copyright Act at 17 U.S.C. § 107 (1977). The Act's preamble lists certain uses of copyrighted material that constitute fair use. These include using copyrighted material "for ·purposes such as criticism, comment, news reporting, teaching, scholarship [and] research." The Copyright Act then lists four factors which should be considered in evaluating whether a particular use is fair. These are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

These factors are important but are not meant to be exclusive. *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230. An analysis of each of these factors and the equities of the case demonstrates that Donnelley's copying of BAPCO's copyrighted material does not constitute a fair use.

### a. *The Purpose of the Use*

It is undisputed that Donnelley's motives in copying the 1984 Miami Yellow Pages were of a purely commercial and for-profit nature. Thus, Donnelley's copying clearly does not fall under any of the listed excusable uses in the preamble to Section 107. Justice Stevens stated that such pure "commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793. *See also Pacific & Southern Co., Inc. v. Duncan*, 792 F.2d 1013 (11th Cir.1986). Although such commercial use standing along may not be enough to deprive one of the fair use defense, *see Meeropol v. Nizer*, 560 F.2d 1061, 1069 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), Donnelley's copying for profit strongly militates against the applicability of the fair use defense.

### b. *Nature of the Copyrighted Work*

As Justice O'Connor explained in *Harper & Row*, "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." 471 U.S. at 560, 105 S.Ct. at 2230. Although "the opportunity to use the fair use defense for copying research is broad, the opportunity to use that defense is narrow once the research is selected and arranged into a

---

**24.** The substantiality of the copying is also an important factor to be analyzed in the fair use defense.

compilation and is copied." *Assoc. Tel. Directory,* 756 F.2d at 810–11. Thus, because BAPCO has selected, coordinated and arranged facts into a compilation, Donnelley's fair use defense is now narrow.

### c. The Amount and Substantiality of the Copying

Donnelley does not contend that the extent of its copying of name, address, telephone numbers and associated classified headings from BAPCO's classified directories is insubstantial or immaterial. In fact, as previously stated, Donnelley has admitted to copying into its computer every listing in BAPCO's directory. Such wholesale copying is strong evidence against the fair use defense. *Sony Corp.,* 464 U.S. at 450, 104 S.Ct. at 792. *See also infra,* subsection three (3) on substantial copying.

### d. The Market Impact

The effect of the use of the copyrighted material on the potential market is perhaps the most significant factor of fair use. *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233. When the use is for commercial purposes, harm to the potential market for the copyrighted work is presumed. *Id.* at 562, 105 S.Ct. at 2231. *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 793. In addition, BAPCO has presented evidence that it is suffering harm to the good will and trust that BAPCO's advertisers have in BAPCO's directories because Donnelley has reproduced its errors, thereby perpetuating such errors a second year. Donnelley has not rebutted the presumption of harm in the market or the above described harm and, therefore, it has failed to satisfy the fourth statutory factor.

### e. Other Factors

█ Donnelley alleges that "keying" (obtaining a copy of the local directory and placing the business listing information of name, address, telephone numbers, and business classification from that directory into a computer base) is a standard industry practice among competitive directory publishers. Donnelley contends that such practice is germane to the fair use defense. This argument is logically and legally insufficient. Such practice is not relevant to the fair use defense.

Donnelley's claim is analogous to that of a driver stopped for speeding. The driver may claim that everybody drives over fifty-five and that it is unfair to stop only him. Just as widespread abuse of speed limits is irrelevant to the crime of speeding, industrial piracy of directories, even if widespread, should not be probative of whether such piracy is a fair use.

The law supports this result. In *Meeropol v. Nizer,* 417 F.Supp. 1201, 1210 (S.D.N.Y.1976), *reversed on other grounds,* 560 F.2d 1061 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756, 196 U.S.P.Q. 592 (1978), the court stated that:

> The alleged standard rule in the publishing industry in the United States that more than 300 words of a copyrighted work does not qualify as a fair use, is not dispositive of a fair use question. Fair use is a legal question to be determined by the court not by alleged industry practice.

While the Second Circuit reversed because genuine issues of fact precluded summary judgment, this does not diminish the effectiveness of the lower court's pronouncement on the irrelevance of industry practice to the fair use defense.

Similarly, in *Maxtone–Graham v. Burtchaell,* 631 F.Supp. 1432, 1436 (S.D.N.Y.1986), *aff'd on other grounds,* 803 F.2d 1253 (2d Cir.1986), the court stated that:

> [T]he doctrine of fair use is a legal doctrine having Constitutional implications, it cannot be subject to definition or restriction as a result of any such trade custom or practice, no matter how long continued. Accordingly, even if such a custom were shown to exist industry wide, and it has not been, it could have no legal force.[25]

---

**25.** *See also Leo Feist, Inc. v. Appollo Records N.Y. Corp.,* 300 F.Supp. 32 (S.D.N.Y.1969), *aff'd,* 418 F.2d 1249 (2d Cir.1970), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970); *Famous Music Corp. v. Seeco Records, Inc.,* 201 F.Supp. 560 (S.D.N.Y.1961); *Southern Music*

Based on this authority and the inherent weakness of Donnelley's position, the Court concludes that industrial piracy in directory compilations is irrelevant to the consideration of the fair use defense.

In determining whether Donnelley's copying constitutes fair use, the Court must engage in a balancing of all of the statutory factors, plus the other factors enumerated and raised by the parties. Upon careful application of the record and in light of the applicable authorities, *see, e.g., Southwestern Bell Media, Inc. v. Trans Western Publishing, Inc.,* 670 F.Supp. 899 at 905 (D.Kansas 1987) (citing *Assoc. Tel. Directory,* 756 F.2d at 810–11), the Court concludes that Donnelley has not met the fair use defense.

### 5. Anti–Trust Defense

In addition to asserting a counter claim against BAPCO for antitrust violations, Donnelley asserts antitrust violations as an affirmative defense to BAPCO's Motion for Summary Judgment on the copyright claim. In essence, Donnelley alleges that BAPCO has driven Donnelley out of the directory business in Southern Florida and violated the antitrust laws by refusing to give Donnelley reasonable and timely access to the information necessary to compete in the directory publishing business. Antitrust violations, however, cannot be a defense to BAPCO's copyright claims.

■ In order for an antitrust affirmative defense to bar enforcement of a Plaintiff's copyright, the. alleged antitrust violation must involve the copyright holder's attempt to extend the exclusionary power granted by its copyright.[26] Courts have ruled uniformly that no valid defense to a copyright infringement claim exists even where it is demonstrated that the copyright owner is violating the antitrust laws,[27] except possibly where there is an attempt to extend the exclusionary power granted by copyright beyond the protected work itself. This narrow exception is based upon *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), where the Supreme Court refused to enforce a Morton Salt patent because Morton Salt had sought to and did extend the exclusionary power granted by its patent beyond the protected product by tying the sale of an unpatented product to a sale of a patented product. Courts have applied this very narrow exception in copyright cases in similar instances, not present here, of illegal tying arrangements. *See M. Witmark & Sons v. Jensen,* 80 F.Supp. 843 (D.Minn.1984), *appeal dism'd sub nom.; M. Witmark & Sons v. Berger Amusement Co.,* 177 F.2d 515 (8th Cir.1949); *Broadcast Music, Inc. v. Moor–Law, Inc.,* 203 U.S.P.Q. 487 (D.Del.1978).

The extremely narrow scope of this exception was explained in *Orth–O–Vision, Inc. v. Home Box Office,* 474 F.Supp. 672 (S.D.N.Y.1979), where the court refused to apply this exception. There, Orth–O–Vision, a middleman for the sale of pay television subscriptions, sued HBO, the pay television transmitter, for antitrust violations alleging a conspiracy to limit plaintiff's ability to supply pay television. HBO counterclaimed for infringements of its copyright. The court noted that "as a general rule, it is no defense to a copyright infringement claim that the copyright owner is violating the antitrust laws." *Id.* at 686. The court then went on to explain that, if there were an exception to this rule, such defense must involve an extension of

*Publishing Co., Inc. v. Seeco Records, Inc.,* 200 F.Supp. 704 (S.D.N.Y.1960).

**26.** This does not mean that a defendant cannot obtain redress against a copyright holder for its violation of the antitrust laws. Affirmative relief against the copyright holder to prevent a continued or remedy a past antitrust violation can be obtained pursuant to a counterclaim.

**27.** *See Orth–O–Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 (S.D.N.Y.1979); *Foreign*

*Car Parts of New England, Inc. v. Auto World, Inc.,* 366 F.Supp. 977, 979 (M.D.Pa.1973) ("It is doubtful that an antitrust violation creates a defense in a copyright infringement action."); *United Artists Associated, Inc. v. N.W.L. Corp.,* 198 F.Supp. 953, 957 (S.D.N.Y.1961); *Harms, Inc. v. Sansom Home Enterprise, Inc.,* 162 F.Supp. 129, 135 (E.D.Pa.1958), *aff'd sub nom, Leo Feist, Inc. v. Lew Tendler Tavern, Inc.,* 267 F.2d 494 (3d Cir.1959).

monopoly power conferred by the copyright:

> The Supreme Court has since recognized that copyright owners may sometimes enjoy analogous market dominance over their copyrighted articles enabling them to exert anti-competitive pressure in non-copyrighted articles, *United States v. Loew's Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), but has not expressly held that a court of equity ought to decline to enjoin infringement where the copyright owner is engaged in such anti-competitive activity. Even if the rationale of Mercoid and Morton Salt were extended to copyrights, Orth–O–Vision has failed to establish its antitrust defense because there is simply no nexus between HBO's alleged anti-competitive actions and its power over copyrighted material. Unlike the patentees in Mercoid and Morton Salt, HBO is not alleged to have used its legal monopoly over the copyrighted material to exert anti-competitive power over non-copyrighted material or to have otherwise used its copyrights to extend legal monopolies beyond their proper scope.

474 F.Supp. at 686. *See Rural Tel. Serv. Co. v. Feist Publications, Inc.*, 663 F.Supp. 214, 220 (D.Kan.1987) (summary judgment granted plaintiff on copyright infringement and anti-trust violations do not constitute defense to copyright infringement); *Knickerbocker Toy Co. v. Winterbrook Corp.*, 554 F.Supp. 1309, 1322 (D.N.H.1982) (dismissed Section 2 counterclaim where "[t]he key link—the exclusionary power of the Knickerbocker copyright, is not alleged."); *Midway Mfg. Co. v. Artic Int'l., Inc.*, 211 U.S.P.Q. 1152, 1161 (N.D.Ill.1981) (alleged antitrust violation not an affirmative defense because it "does not relate directly to the claim of copyright infringement").

■ Based upon the foregoing authorities, if Donnelley's antitrust affirmative de-

fense could bar enforcement of BAPCO's copyrights, Donnelley would have to show that BAPCO sought to extend the exclusionary power granted by its copyrights beyond the protection of the copyrighted directories. In its counterclaim and not in its affirmative defense, Donnelley alleges that counterdefendants violated the antitrust laws because Southern Bell failed to provide Donnelley with updated listing information received by Southern Bell from subscribers and supplied to BAPCO. Donnelley further alleges in its counterclaim that BAPCO improperly failed to permit Donnelley to copy BAPCO's entire classified directory. Such claims do not allege that BAPCO has attempted to extend the exclusionary power granted by its copyrights beyond the protected work itself. Moreover, Donnelley has failed to make any claim or offer any evidence that BAPCO has used its copyrights to prevent Southern Bell from providing Donnelley with raw data supplied by Southern Bell to BAPCO. The Court concurs with prior case law in concluding that antitrust violations generally do not constitute a defense to copyright infringement. The Court further finds that Donnelley has not satisfied the narrow exception to this rule. Accordingly, Donnelley's affirmative defense of antitrust violations does not bar the entry of summary judgment for copyright infringement.

In sum, upon careful review of the record and applicable law, the Court concludes that no genuine issues of material fact exist; and, therefore, BAPCO's Motion for Summary Judgment on the copyright issues is GRANTED and Donnelley's Motion for Summary Judgment is DENIED.

### B. TRADEMARK/UNFAIR COMPETITION

Donnelley moves for partial summary judgment on counts two [28] and four [29] of

---

**28.** Specifically, count two of BAPCO's amended complaint alleges as follows:

45.

> On information and belief, by using the trademarks, words and symbols "Yellow Pages" and the "Walking Fingers" logo, and by unlawfully using BAPCO's copyrighted 1984 Mia-

mi Yellow Pages, and by telling customers that Donnelley has "published" Southern Bell's Yellow Pages classified directories, and by telling customers that Southern Bell will no longer publish a classified directory, Donnelley has used a false designation of origin and/or a false description or representation,

BAPCO's amended complaint, which assert that Donnelley's use of the term "yellow pages" and the "walking fingers" logo, among others, constitutes federal statutory and common law unfair competition respectively. In support of its motion, Donnelley argues that BAPCO can assert no exclusive right in either the term "yellow pages" or the three-finger "walking fingers" logo. In particular, Donnelley argues that the "walking fingers" logo is in the public domain because the symbol is used by the entire classified directory industry; thus, the symbol fails to "identify and distinguish" the mark owner's goods "from those manufactured by others and to indicate the source of the goods" as required by 15 U.S.C. § 1127. Donnelley further argues that BAPCO cannot claim exclusive rights in the term "yellow pages" because the term is generic and thus not protectable under trademark law.[30]

BAPCO contends that summary judgment is improper as to counts two and four because a combination of Donnelley's actions, including among others the use of the term "yellow pages" and the "walking fingers" logo, constitute unfair competition. Although BAPCO admits that it does not claim exclusive rights to the term "yellow pages," BAPCO asserts that Donnelley has used the term and the logo to confuse the public through copyright and trade-

mark infringement in violation of the laws prohibiting unfair competition.

Donnelley has also moved for summary judgment on count three of BAPCO's amended complaint for infringement of the registered two-finger "walking fingers" trademark and on its counterclaim to cancel BAPCO's registration for the two-finger "walking fingers" logo. Donnelley contends that BAPCO and its affiliates have abandoned the two-finger mark because it has not been used in the Bell South area since 1978–79.[31]

BAPCO admits that it did not use the two-finger logo from 1979 until 1985 and that its use in 1985 followed the initiation of this lawsuit. Although this constitutes *prima facie* evidence of abandonment, it may be overcome by evidence of an intent to resume use of the mark. *Humble*, 524 F.Supp. at 465. BAPCO submits that such intent is evidenced by BAPCO's continual use of the similar three-finger logo in conjunction with its use of the two-finger logo because each logo creates the same commercial impression.

A careful review of the record demonstrates that there are numerous genuine issues of material fact in dispute. As to count three of BAPCO's amended complaint and Donnelley's counterclaim to cancel registration of the two-finger "walking fingers" logo, genuine issues of fact exist

of its goods and/or services and is therefore liable in a civil action by plaintiff under Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125.

**29.** Similarly, count four of BAPCO's amended complaint alleges as follows:

51.
On information and belief, by using the trademarks, words and symbols "Yellow Pages" and the "Walking Fingers" logo, and by unlawfully using BAPCO's copyrighted 1984 Miami Yellow Pages, Donnelley has used a false designation or origin and/or a false description of representation of its goods and/or services to create a likelihood of confusion as to the source, sponsorship or affiliation, of Donnelley and Donnelley's directory and to pass off Donnelley as BAPCO or Southern Bell.

52.
On information and belief, by telling customers that Southern Bell is no longer going to

publish a classified directory in the Greater Miami are, by telling customers that Donnelley has published Southern Bell's Yellow Pages classified directories in the past and by telling customers that Donnelley is now taking over the task of publishing the classified directory in the greater Miami area, Donnelley has attempted to pass itself off as BAPCO or Southern Bell and has committed fraud on the public all to BAPCO's damage.

**30.** *See, e.g., Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 114, 59 S.Ct. 109, 111, 83 L.Ed. 73 (1938); *Miller Brewing Co. v. G. Heilman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir.1975).

**31.** *See Exxon Corp. v. Humble Exploration Co., Inc.,* 524 F.Supp. 450, 464–65 (N.D.Texas 1981), *aff'd,* 695 F.2d 96 (5th Cir.1983) (non-use of a mark for two consecutive years *prima facie* evidence of abandonment).

as to the issue of abandonment and BAPCO and its affiliates' intent to resume commercial use of the two-finger logo. As to counts two and four of BAPCO's amended complaint, issues of fact exist in light of BAPCO's "Directory and Symbol Study"[32] and BAPCO's "Symbol Study."[33] The first Symbol Study, which shows that the public to some extent recognizes the three-finger logo as a trademark indicating BAPCO or one of its affiliates, creates a factual issue as to whether the logo has been dedicated to the public. Similarly, the Directory Study and the second Symbol Study, which demonstrates that the public to some extent associates the identifying elements of the "yellow pages" term and the walking fingers logo as used in connection with a BAPCO directory, creates issues of fact as to the trademark significance of both the three-finger logo and the term "yellow pages."

The above described genuine issues of material fact preclude granting summary judgment as to the trademark issues.[34] Accordingly, Donnelley's Motions for Summary Judgment as to counts two, three and four of BAPCO's amended complaint and as to its counterclaim to cancel BAPCO's registration for the two-finger "walking fingers" logo are hereby DENIED.

## C. ANTITRUST

In its amended answer Donnelley counterclaims against BellSouth, Southern Bell and BAPCO alleging that the three Bell companies together have violated federal and state antitrust laws. Counts one and two are for monopolization and attempted

monopolization and allege violations of Section 2 of the Sherman Act (15 U.S.C. § 2). Count three alleges this same conduct is in violation of Florida Statutes Section 542.19. The gravamen of Donnelley contentions is that the Bell Companies have a monopoly in the market for the sale of advertising and have willfully maintained such monopoly power by not providing Donnelley with enough information, such as business classifications and updates, allegedly essential to compete in the directory business, in a timely fashion so as to enable Donnelley publish a competing directory.

All three of the Bell companies have moved individually for summary judgment against Donnelley on the antitrust counterclaims. Southern Bell generally contends that: (1) it does not have monopoly power in the relevant market, which is that of business information; (2) it has provided Donnelley with all the information necessary to compete and has not refused to deal with Donnelley; and (3) Donnelley has not offered sufficient evidence of "injury-in-fact" to avoid summary judgment. Bell-South and BAPCO's basis for summary judgment will be addressed hereafter.

The elements of a monopoly in violation of Section 2 of the Sherman Act are set forth in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The offense of monopoly consists of: "(1) the possession of monopoly power in the relevant market and (2) the willfull acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

---

**32.** Two separate surveys were conducted on the same day. In the Directory Study people were given a 1985–86 Donnelley Yellow Pages and then asked which company put out the directory. Over three times as many people thought the Donnelley directory was published by BAPCO as thought the directory was published by Donnelley. In the Symbol Study people were shown a naked replica of the three-finger "walking fingers" logo and asked which company uses the symbol. Roughly 59% of those surveyed thought the logo was a symbol identifying BAPCO or its affiliates and only 1% thought the symbol to identify Donnelley.

**33.** In the Symbol Study the interviewer explained the difference between a brand name and a generic term to each respondent. Each respondent was then shown six symbols, including Mr. Peanut, Walking Fingers, RX, Skull & Crossbones, Morton's Salt Girl and a Barber Pole, and then asked whether or not the symbol is a brand of product. The survey yielded high percentages of 97, 94 and 74 respectively for Mr. Peanut, Morton's Salt Girl and Walking Fingers.

**34.** BAPCO is given the benefit of all reasonable doubts and favorable inferences. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Kypta v. McDonald Corp.,* 671 F.2d 1282 (11th Cir.1982).

*Id.,* at 570–71, 86 S.Ct. at 1703–04. *See also St. Joseph's Hospital v. Hospital Corp. of America,* 795 F.2d 948 (11th Cir. 1986). Proof of a private monopolization claim also requires proof of a causal relationship between the antitrust violation and specific injury to plaintiff's business or property. *McClure v. Undersea Indus., Inc.,* 671 F.2d 1287, 1289 (11th Cir.1982); *Drinkwine v. Federated Publications, Inc.,* 780 F.2d 735, 738–39 (9th Cir.1985), *cert. denied,* 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). To prove an attempt to monopolize plaintiff must show a specific intent to accomplish monopolization and that there existed a dangerous probability that the attempt would be successful. *Ad–Vantage Telephone Directory Consultants v. GTE Directories,* 849 F.2d 1336, 1341 (11th Cir.1987); *Spectrofuge Corp. v. Beckman,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

The offenses of both monopoly and attempt to monopolize require proof of the relevant product and geographic markets, which are a question of fact for the jury. *Ad–Vantage,* at 1341. Both claims also require proof of the intent of defendants to acquire or maintain a monopoly, which necessarily requires a factual determination from the evidence presented.

In the offense of monopoly (which Donnelley chiefly relies upon), the need to prove defendant's intent is obviated if the plaintiff successfully demonstrates that it has been denied an essential facility. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Southern Bell argues that only tangible physical objects are "facilities" and, as such, because the Bell Companies allegedly withheld from Donnelley only information, the essential facilities doctrine does not apply. Southern Bell further buttresses its argument with *Directory Sales Management Corp. v. Ohio Bell Telephone Co.,* 833 F.2d 606 (6th Cir.1987), which states that the service of business classifications is not an essential facility because such information is unreliable and thus, has to be duplicated in any event by a competitor.

Although the doctrine of essential facilities has been applied predominantly to tangible assets, there is no reason why it could not apply, as in this case, to information wrongfully withheld. The effect in both situations is the same: a party is prevented from sharing in something essential to compete. *See Driscoll v. New York,* 650 F.Supp. 1522, 1529 (S.D.N.Y. 1987) (essential facilities doctrine applies "where there has been 'denial of access to physical structures or discreet [sic] services.'" (citing *Midsouth Grizzlies v. National Football League,* 550 F.Supp. 558, 570 n. 32 (E.D.Pa.1982)). In addition, the opinion in *Ohio Bell* appears to base its ruling on the "uncontroverted evidence," in that the plaintiff would not be given a competitive advantage because the business classifications are unreliable. No such evidence of unreliability exists in this case. Accordingly, Donnelley is not precluded from attempting to prove intent by using the essential facilities doctrine in conjunction with other evidence that the Bell companies willfully maintained a monopoly.

■ The application of the essential facilities doctrine raises genuine issues of material facts. Specifically, there are clear factual disputes as to the essentiality of the data Donnelley seeks and the availability of such data from sources alternative to the Bell companies. Moreover, there are numerous other factual issues in dispute under the rubrics of antitrust. Indeed, the parties cannot even agree on the very first issue in a monopoly claim—the relevant market. Donnelley contends the relevant market is for the sale of advertising directories and Southern Bell claims the market is in business information. The issue is factual, *see Ad–Vantage,* at 1341.

In sum, the plethora of factual disputes on the antitrust issues include:

1. The relevant market for the purposes of Section 2 liability;

2. Whether the Bell companies have a monopoly in such market;

3. Whether the data Donnelley seeks is essential to compete in the relevant market;

4. Whether such data may be obtained from other sources;

5. Whether the Bell companies have engaged in anticompetitive activity with the requisite intent;

6. Whether Donnelley requested certain information from Southern Bell in addition to that contracted for and whether such request was ignored;

7. Whether Southern Bell offered Donnelley such additional information; and if so, whether such offer was linked to concessions by Donnelley on the copyright issues;

8. Whether Southern Bell gave Donnelley sufficient data to realistically compete in the market for directories; and,

9. Whether the Bell companies' actions have caused Donnelley injury in fact.

Accordingly, these and other genuine issues of material fact preclude the entry of summary judgment at this time.

The final set of antitrust issues concern whether BellSouth and or BAPCO are proper defendants to Donnelley's antitrust counterclaims. Donnelley alleges that BellSouth, Southern Bell and BAPCO ("Bell Companies") jointly comprise an enterprise subject to liability under Section 2 of the Sherman Act as a matter of law. Donnelley contends that *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), "plainly establishes that the 'flip side' of abolishing the intra-enterprise conspiracy doctrine is that a family of corporations is an 'enterprise'—in the language of *Copperweld*—which is to be treated under Section 2." Concise Statement of Donnelley pursuant to Order of April 3, 1987 at 37–38. Alternatively, Donnelley argues that if a factual inquiry is made, then BellSouth and BAPCO's involvement in the "enterprise" is evidenced by their conduct.[35]

BellSouth contends that no federal decision, including *Copperweld,* holds that a parent company is or should be liable as a matter of law under Section 2 for the alleged unlawful activities of its subsidiaries when the parent has not engaged in any anti-competitive conduct. Concise Statement of BellSouth pursuant to Order of April 3, 1987 at 3. In addition, BellSouth argues that Donnelley has failed to submit any evidence in support of its contention that BellSouth has itself engaged in anti-competitive activity or that it should be vicariously liable[36] for the alleged unlawful activities of its subsidiaries. BAPCO argues that its only alleged improper act is the filing of this lawsuit against Donnelley and that such conduct is protected from antitrust attack by the *Noerr–Pennington* doctrine as formulated in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad President Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). BAPCO's Motion for Summary Judgment on Antitrust Issues at 9. Further, BAPCO claims that it is not liable for Southern Bell's actions as a matter of law or fact. The Court will address BellSouth's motion and then that of BAPCO.

In *Copperweld,* the United States Supreme Court addressed a situation in which anti-competitive conduct was explicitly coordinated and accomplished by two corporations. The Court held that a parent corporation and its wholly-owned subsidiary cannot be considered separate entities for purposes of a conspiracy allegation pursuant to Section 1 of the Sherman Act. In so holding, the Court rejected the long standing intra-enterprise conspiracy doctrine and recognized that a parent and subsidiary have a unity of purpose that renders unrealistic any attempts to treat them

---

**35.** This is consistent with the Court's prior denial of summary judgment in open court as to the trademark issues. *See* Transcript of Status Conference on May 22, 1987 at 53.

**36.** Because Donnelley has alleged that BellSouth has engaged in unlawful conduct in furtherance of a monopolistic scheme, BellSouth's vicarious liability is not at issue. Donnelley's Memorandum in Opposition to BAPCO and BellSouth's Motion For Summary Judgment on Antitrust Issues at 14.

as totally independent for conspiracy purposes.

Donnelley bottoms its argument that BellSouth, as the parent corporation of Southern Bell, is liable as a matter of law on a few passages in *Copperweld.* For example:

[A] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a team of horses drawing a vehicle under the control of a single driver. *Id.* 467 U.S. at 771, 104 S.Ct. at 2741.

The Court also stated that the "single entity" test, which measure the separateness of a subsidiary, is inadequate.

to describe a separate economic entity for purposes of the Sherman Act. The factors [to determine separateness] simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and subsidiary must be viewed as a single economic unit. *Id.* at 773 n. 18, 104 S.Ct. at 2742 n. 18.

The Court concluded its opinion stating that "[a] corporation's initial acquisition of control will always be subject to scrutiny under § 1 of the Sherman Act.... Thereafter, the enterprise is fully subject to § 2 of the Sherman Act...." *Id.* at 777, 104 S.Ct. at 2744.

■ This Court is thus faced with the novel issue of whether *Copperweld* should be extended to permit a parent corporation to be held liable for the conduct of its affiliates even when the parent has not engaged in unlawful conduct. No court has yet to interpret the dicta in *Copperweld* in this manner; and this Court declines to be the first. *See United National Records, Inc. v. MCA, Inc.,* 616 F.Supp. 1429, 1433 (N.D.Ill.1985) (holding that *Copperweld* does not overrule state corporate law which provides for limited liability of a parent corporation). As mentioned, *Cop-*

*perweld* is a Section 1 case and that opinion only addressed the issue of separate corporate entities as it related to allegations of conspiracy. No such conspiracy is even alleged in this case and thus, BellSouth (and BAPCO) are not liable under *Copperweld* as a matter of law for Southern Bell's actions.

■ Donnelley has alleged, however, that BellSouth has itself engaged in anticompetitive activity in that:

1. A Corporate Policy Council composed of the most senior officers of BellSouth approved the formation of BAPCO and the form contract between BAPCO and Southern Bell.

2. BellSouth's direction of and involvement in the business of its subsidiaries, including its exercise of alleged direct control over decisions relating to their marketing of subscriber listing data bases.

3. BellSouth's sponsorship of Competitive Evaluation and Strategy Workshops for its subsidiaries, including Southern Bell and BAPCO.

4. BellSouth's provision of support services to BAPCO, including the provision of alleged critical assistance to BAPCO in developing an advertising campaign which would allegedly exploit the advantages gained by BAPCO through the Bell companies' alleged refusal to provide competitors with complete and up-to-date subscriber listing information.

5. That BellSouth officers serve as BAPCO directors.

Concise Statement of Donnelley pursuant to Order of April 3, 1987 at 38; Donnelley's Memorandum in Opposition to Motions by BAPCO and BellSouth For Summary Judgment on Antitrust Issues at 17–24 and affidavits and depositions cited therein. Supplemental Factual Statement of Donnelley in Opposition to Bell Companies' Motions For Summary Judgment on Antitrust Issues. The Court concludes that Donnelley's allegations of BellSouth's involvement and control of alleged antitrust activities, among others as supported by various affidavits and deposition testimony, are barely sufficient to defeat BellSouth's Motion For Summary Judgment on the antitrust is-

sues. However, these issues should be properly evaluated by a jury, whose verdict will undoubtedly reflect the extent, if any at all, of BellSouth's alleged unlawful activities.

The only wrongful act by BAPCO specifically alleged in the counterclaim is the filing of the complaint against Donnelley. Donnelley has since engaged in a massive discovery effort, evidenced by the voluminous file in this case, and has not alleged any significant additional facts regarding unlawful monopoly conduct by BAPCO. Donnelley's new allegations include its principal claim that the agreement between Southern Bell and BAPCO covering directory operations, by itself, is enough to make BAPCO liable for the alleged monopolization scheme. Donnelley's Memorandum in Opposition to Motions by BAPCO and Bell-South For Summary Judgment on Antitrust Issues at 24. Donnelley also asserts that in early 1984 Southern Bell's personnel told an independent directory publisher that they would need BAPCO's approval to furnish subscriber information to that publisher. Supplemental Factual Statement of Donnelley in Opposition to Bell Companies' Motions For Summary Judgment on Antitrust Counterclaims at 13 and cited deposition. Donnelley finally contends that BAPCO has supplied subscriber listing data to an independent directory publisher to fulfill obligations of a contract between that publisher and Southern Bell and that BAPCO has provided at least one extract of business listings for use by a competitive analyst studying interexchange carriers. *Id.* at 13–14.

Although Donnelley contends that BAPCO's liability can be premised on the agreement between BAPCO and Southern Bell, Donnelley does not base its claim on the existence of the agreement. Rather, Donnelley objects to Southern Bell's alleged refusal to provide Donnelley with the identical information and services provided to BAPCO. The agreement between BAPCO and Southern Bell does not restrict Southern Bell from providing listing data or services to any third party. Because Southern Bell's agreement with BAPCO provides Southern Bell, and only Southern Bell, with the power to give or refuse to give subscriber listing data to third parties, the agreement itself fails to show any unlawful conduct by BAPCO. Donnelley's other contentions are tenuously supported by deposition testimony and do not offer persuasive evidence that BAPCO, as opposed to the other Bell Companies, had anything but tangential involvement in the alleged anticompetitive activity. Accordingly, Donnelley has failed to offer "significant probative evidence demonstrating that a genuine issue of fact exists," as the party opposing summary judgment must do, with respect to anti-competitive activity of BAPCO. *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 554 (5th Cir.1980). BAPCO's Motion For Summary Judgment with respect to Donnelley's antitrust affirmative defenses and counterclaims is therefore GRANTED.

## IV. CONCLUSION

In summary, it is hereby

ORDERED and ADJUDGED as follows:

1. BAPCO's Motion For Summary Judgment on the copyright claims is GRANTED and Donnelley's Motion For Summary Judgment on the copyright claims is DENIED.

2. Donnelley's Motion For Summary Judgment on the trade-mark claims and on its counterclaim to cancel BAPCO's registration of the two-finger "walking fingers" logo are DENIED.

3. BellSouth and Southern Bell's Motions For Summary Judgment on Donnelley's antitrust counterclaims are DENIED.

4. BAPCO's Motion For Summary Judgment on Donnelley's antitrust counterclaims and affirmative defenses is GRANTED.

5. This case will be set for trial on the remaining issues by separate order.

DONE and ORDERED.